IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMY WANG<br>1359 Northwyck Court<br>McLean, VA 22102 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Civil Action No. _____ |
| WASHINGTON METROPOLITAN<br>AREA TRANSIT AUTHORITY<br>600 Fifth Street, N.W.<br>Washington, D.C. 20001, | )<br>)<br>)<br>)<br>)<br>) |
| Defendant, | )<br>) |
| Serve: | )<br>) |
| Office of General Counsel<br>Washington Metropolitan Area<br>Transit Authority<br>600 Fifth Street, N.W.<br>Washington D.C. 20001 | )<br>)<br>)<br>)<br>) |

CIVIL COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY

1.      Plaintiff Amy Wang brings this suit against Defendant Washington Metropolitan

Transit Authority (WMATA) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000(e), *et seq*.

## INTRODUCTION

2.      Amy Wang, a Chinese-American female, was a seven-year employee of WMATA

and served as the Financial Control Manager in WMATA's Office of Accounting.

3. In 2011 and 2012, WMATA rated Wang as either "competent" or "exceeds expectations" for each metric in her performance evaluations and also noted that Wang "has good interpersonal skills and communicates well with customers."

4. On September 5, 2013, Wang's first-line supervisor, Assistant Comptroller Ian Greaves, told Wang that he was reassigning one of her direct reports to another team.

5. Wang voiced her concerns about the potential effects of the reassignment on her team's performance.

6. In response, Greaves issued Wang a written warning and a verbal reprimand for alleged "insubordination" in voicing her concerns about the reassignment.

7. Wang told Greaves that such discipline appeared to be an abuse of authority; and Greaves then asked Wang if she intended to hire a lawyer.

8. Wang replied, "Maybe" and Greaves responded by yelling at Wang, "You are fired! You are fired! Immediately!"

9. Greaves later told Wang that she was not terminated immediately.

10. That same day, Wang reported Greaves's threat to fire her to WMATA's Office of Inspector General (OIG), saying that she felt scared, threatened, and insulted by Greaves's behavior.

11. Wang also reported Greaves's conduct to WMATA's Civil Rights Office on September 11, 2013, saying that Greaves had discriminated against her on the basis of her race, national origin, and sex.

12. A few hours after Wang made her oral complaint to the Civil Rights Office, Greaves, Comptroller Stephanie Audette, and Equal Employment Office officer Belinda Press met with Wang and placed her on a Corrective Action Plan (CAP).

13.     The CAP stated that Wang had issues with communications, in stark contrast to the comments in her most recent performance evaluations.

14.     The CAP also contained several unreasonable deadlines, some of which were set for the same day.

15.     On September 22, 2013, and on October 2, 2013, Wang again reported that she was being subjected to discrimination; and also reported that she was suffering retaliation, through the CAP, for her earlier opposition to discrimination.

16.     On October 10, 2013, before Wang submitted her completed CAP, WMATA terminated Wang.

## PARTIES

17.     Plaintiff Amy Wang is a resident of McLean, Virginia and a former employee of WMATA.  She is an "employee" as defined in Title VII.

18.     Defendant WMATA is a government agency that provides transit service in the Washington metropolitan area.  WMATA was created by the United States Congress as an interstate compact between the District of Columbia, the State of Maryland, and the Commonwealth of Virginia.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over WMATA because it conducts regular business in the District of Columbia and because it maintains regular and systematic contacts with the District of Columbia.

20.     This Court has subject matter jurisdiction of this action by reason of Title VII because the case involves agency action regarding unlawful discrimination based on national origin, race, and gender.

21.     Venue is proper under 28 U.S.C. § 1391(b) in this Court because it is the judicial district where many of the unlawful employment practices are alleged to have been committed.

22.     On October 2, 2013, Wang filed a charge with the U.S. Equal Employment Opportunity Commission (EEOC).  On January 14, 2014, Wang filed an amended charge with the EEOC and 180 days have passed since that date.  Accordingly, Wang has the right to pursue her claims in this Court.  *See Thomas v. Washington Metropolitan Area Transit Authority,* 907 F. Supp. 2d 144, 153 (D.D.C. 2012).

## FACTUAL ALLEGATIONS

**Wang performed her duties successfully at WMATA, starting with her hire in 2006 and continuing through 2013.**

23.     Wang is a forty-seven year old female who was born and raised in Heilongjiang Province in China.

24.     In 1998, Wang and her husband moved to the United States and Wang studied English full-time for about a year.

25.     In or about May 2006, Wang began working as a Manager in WMATA's Financial Control Branch, which is one of the largest branches within WMATA's Office of Accounting.

26.     Wang's responsibilities included the following: establishing and maintaining the General Ledger module; monitoring interfaces between the General Ledger and its supporting sub-systems; reconciling all cash, bank, and investment and inventory balances; processing jurisdictional billings and receipts; reconciling various accounts such as retirement fund accounts, worker's compensation accounts, third party liability accounts and pension accounts; and performing month-end and year-end General Ledger closing procedures.

27.     Additionally, while other employees in positions similar to Wang's were responsible for only one financial system module, Wang was responsible for three modules: the General Ledger module, the Accounts Receivable module, and the Billing module.

28.     The two supervisors and a financial analyst directly reported to Wang.

29.     In 2007 and 2008, WMATA gave Wang excellent performance evaluations.

30.     In 2009, WMATA placed Wang on a CAP, which she successfully completed, and WMATA rated Wang as "competent" in 2009.

31.     Following the CAP, Wang continued to excel in her position.

32.     In 2010, Wang, with IT, successfully completed several Financial System Integration implementation projects that automated and improved WMATA's business processes and eliminated manual work in Wang's areas of responsibility.

33.     In 2011 and 2012, WMATA rated Wang as either "competent" or "exceeds expectations" for each metric in her performance evaluations.

34.     In 2011, Wang's supervisor recognized her as "a very strong contributor" who "stepped up to every challenge" and "was always willing and available" to offer her "time or effort."

35.     Wang's supervisors described her as exhibiting "a high level of integrity" and said that she "instills a sense of integrity and trust in her staff."

36.     Wang's supervisors also noted that she "has good interpersonal skills and communicates well with customers" and was "a very hardworking, loyal and knowledgeable member of the CFO management team."

37.     Because of Wang's strong performance, WMATA periodically increased Wang's compensation; her salary increased from $75,000 in 2006 to $108,000 in 2013.

38.     But WMATA compensated Wang, and another Chinese-American manager, less than similarly-situated employees.

39.     In or about August 2012, WMATA hired Ian Greaves as Assistant Comptroller, making him Wang's first-line supervisor.

40.     During Greaves's first year with WMATA, Wang occasionally trained and advised Greaves on various business and accounting procedures.

41.     On February 1, 2013, Greaves issued Wang her 2012 performance evaluation.

42.     In this evaluation, Greaves rated Wang as competent in many areas and rated her as "exceeds expectations" in the areas of customer focus, decision making and innovation.

43.     Greaves rated Wang's interpersonal skills as competent, said that "Amy has a positive attitude but needs to work on her communication.  She is not always clear in the information she is sharing."

**In September 2013, Wang voiced concerns when WMATA, through Greaves, removed a supporting employee from Wang's branch; and Greaves issued  Wang a written and verbal warning the next day for alleged "insubordination."**

44.     On September 5, 2013, Greaves held a meeting with Wang, Accounts Payable Manager Jessie Li, Accounts Receivable Supervisor Dale Dixon, and Financial Analyst Francisco Julia.

45.     During this meeting, Greaves told Wang that he planned to transfer Julia from Wang's branch to Li's branch.

46.     Greaves said that Wang could not hire a replacement for Julia's position and Wang's branch would have to carry out Julia's former duties without a replacement.

47.     Wang told Greaves that Julia had important responsibilities in her department and it would be difficult, if not impossible, for her branch to absorb the work without a replacement.

48.     Wang expressed her concerns professionally and did not display anger or behave in any way that was "insubordinate."

49.     Julia's responsibilities under Wang included the following: preparing quarterly jurisdictional and subsidiary billings; preparing control sheets to validate amounts by jurisdiction and General Ledger accounts; creating billing in accounting system using each jurisdiction's established customer account; completing accounts receivable payment applications and maintaining a control sheet of the billed and received amounts; reconciling jurisdictional accounts; and preparing quarterly reports of the jurisdictional balance.

50.     Instead of addressing Wang's concerns, Greaves angrily warned her, "I am the director!"

51.     Greaves then abruptly ended the meeting after requesting a transition plan from Wang.

52.     After the meeting, Wang stayed in Greaves's office to try to have a further discussion of the realignment.

53.     Greaves said, "This is Stephanie [Audette's] suggestion.  If you say it is not possible, then the meeting is ended now."

54.     Comptroller Audette was Wang's second-line supervisor and Greaves's direct supervisor.

55.     The discussion lasted only a few minutes and Wang returned to her desk.

56.     Later that afternoon, Wang emailed her second-line supervisor, Audette, to report the meeting with Greaves and the decision to transfer Julia, and to request a meeting with Audette.

57.     In her September 5, 2013 email to Audette, Wang said the following:

7

I need to bring to your attention an issue that has occurred with my
direct supervisor. Today, Ian [Greaves] called a meeting and told
me that he was taking Francisco [Julia] and that I would have to
assume all of his responsibilities. I explained to him that this was
not possible as everyone is already working to capacity and that we
could not simply absorb all of his duties. When I expressed my
concerns, he abruptly and angrily said the meeting was ended.  I
feel that I am being taken advantage of because I do not complain
and just get the job done. I have been here for over seven years and
I know every aspect of what my section is required to accomplish
and to outwardly dismiss my concerns is insulting. You know
that I am very dedicated to Metro and to my job and to take an
action that could hinder our ability to accomplish our assigned
tasks without any justification or explanation is a real concern to
me. I'm not sure about my next step but I would like to discuss this
with you at your convenience.  Thank you.

58.     The next morning, on September 6, 2013, Greaves met with Wang and ordered

her immediately to train two direct reports on certain month-end duties.

59.     Wang explained to Greaves that such training was inappropriate, as one of the

employees had already received training and the other employee lacked the necessary security

access.

60.     Greaves repeated his order to Wang to train the employees.

61.     Less than an hour later, Greaves came to Wang's office and issued Wang a written

warning and a verbal reprimand.

62.     The written warning was dated September 5, 2013 and alleged that Wang was

insubordinate in the September 5, 2013 meeting.

63.     The warning issued by Greaves said the following:

This memo is to issue a disciplinary warning as a result of an act of
insubordination you committed on September 5, 2013 (today) during a
department planning meeting that was conducted in my office. The
meeting participants were Francisco Julia, Jessie Li, Dale Dixon, Amy
Wang (you), and Ian Greaves (me).

You disagreed with my directive to allocate the duties currently performed by Francisco to the Accounts Receivable (AR) staff, thereby realigning the AR branch responsibilities. In addition to emphatically defying a directive, you ignored multiple verbal warnings and continuously interrupted the discussion. I attempted to give you a more confidential setting to express your concerns by dismissing the staff and inviting only Tywanda Diggs to the meeting. Yet, you continued to disrupt that session as well.

Your behavior as a manager in the presence of peers and your subordinates was unprofessional. As a manager, you are in a trusted position where a higher level of accountability is expected of you to conduct yourself as a professional and serve as a role model for your subordinates.

Further displays of insubordinate behavior will not be tolerated and can result in further disciplinary action up to and including termination, Metro/Policy Instruction 7.8.5, Disciplinary Actions.

Again, please provide the realignment of duties as requested by 5:00 PM September 13, 2013.

64.     Greaves copied Audette on the warning.

65.     Greaves's description of Wang's behavior on September 5, 2013 as

"insubordinate" and disruptive was inaccurate.

**When Wang mentioned the possibility of retaining an attorney in response to what she considered Greaves's abuse, Greaves immediately told Wang that she was fired, and then ordered her to leave.**

66.     After Greaves issued the warning, Wang attempted to discuss it with him in her

office.

67.     Greaves angrily yelled at Wang when she attempted to discuss the warning.

68.     Wang asked Greaves to "please be professional in the office," to "not yell and

scream," and to "not abuse [his] authority."

69.     Greaves asked Wang if she intended to hire a lawyer about his alleged abuse.

70.     Wang replied, "Maybe."

71.     Greaves waved his finger close to Wang's face and yelled, "You are fired! You are fired! Immediately!"

72.     A few minutes later, Greaves returned to Wang's office and yelled, "You are not fired, but I want you to leave the office right now!"

**Wang reported Greaves's abusive behavior, and retaliatory threat, to WMATA's OIG and to Audette.**

73.     That same morning, on September 6, 2013, Wang went to WMATA's Office of Inspector General (OIG) to report what had occurred.

74.     Wang spoke to Special Agent Mark Coulter, who told Wang to stay at the office and explained that WMATA had specific procedures and protocols for terminations which Greaves did not appear to have followed.

75.     Coulter also said that OIG would investigate and report regarding the incident.

76.     When Wang returned to her office, she found a note on her computer from Greaves, requesting that Wang meet with him and Audette before leaving the office for the day.

77.     Greaves also sent an email to Wang, saying that he and Audette wanted to "review expectations" and that Wang was expected to report to work the following Monday.

78.     Greaves then came to Wang's office and escorted her to Audette office, and then left.

79.     Wang told Audette that she felt scared, threatened, and insulted by Greaves's behavior.

80.     Wang also told Audette that she had reported his behavior to the OIG.

81.     Audette told Wang that she could leave early for the day if she wished and that Audette would schedule a meeting for the following week.

82.     Wang returned to her duties and worked a full day.

**On September 11, 2013, Wang made a discrimination complaint to WMATA's Civil Rights Office and to an EEO officer.**

83.     As of the morning of September 11, 2013, Wang had not received any further communication from Audette or the OIG.

84.     On September 11, 2013, Wang thus went to WMATA's Civil Rights Office and made an oral complaint regarding Greaves's treatment of her.

85.     Wang spoke to Civil Rights Coordinator N. Lisa Johnson, who directed Wang to speak to EEO officer Belinda Press.

86.     Wang spoke briefly with Press; she told Press that she intended to file a complaint against Greaves for discriminating against her on the basis of her race, national origin, and sex.

87.     Press told Wang that she would contact Wang later to obtain the details of her complaint.

**Later on September 11, 2013, WMATA issued Wang another written warning and placed her on a CAP.**

88.     After Wang's meeting at the Civil Rights Office, Greaves sent Wang a request for a meeting at 4:30 p.m. that day.

89.     Wang believed that the purpose of this meeting was to discuss the details of her oral complaint filed earlier in the morning.

90.     But when Wang arrived at the meeting, Greaves issued Wang another written warning and a CAP.

91.     The warning said the following:

> This memo serves as a **written warning** for professional misconduct and performance regarding behaviors you exhibited on Friday, September 6, 2013, as well as on-going lack of follow-up on action items requested by management.

At about 9 AM on Friday, September 6, 2013 I attempted to give you a verbal and written warning for your insubordinate behavior during a staff meeting on Thursday, September 5, 2013. Your actions during and following my attempt to issue that warning clearly demonstrated to me that you had no remorse for your behavior. You continuously talked while I was speaking to you and refused to stop when I asked you to do so. This confirmed your lack of regard and respect for me and my office.

Later that morning, you had an opportunity to speak with Stephanie and me in my office, and yet again, you continuously interrupted me while I attempted to discuss expectations for you to train your supervisors on month-end closing procedures.

As part of your 2013 performance goals, I requested that you take action to improve your communication. Since the issuance of your 2013 goals, we have had more than one meeting (i.e. June 7, 2013 1-n-1 and Feb 1, 2013 goals discussion) in which I reiterated your need to fulfill this goal. As a manager you are expected to communicate effectively and properly to everyone including all WMATA personnel and business partners. I noted this in your 2012 annual performance review and your 2013 performance goals.

To date you have made no progress as indicated by your email correspondence and discussions with me. Moreover, you do not display a willingness to make any improvement. Your insubordination to me and your lack of respect for your own subordinates (as indicated by your emails to your staff) substantiate this observation.

These behaviors cannot be tolerated and once again, this memo is to inform you that you are being placed on verbal and written warning. Over the next 30 days, I will review and evaluate your behavior in this manner. I will also work with you if you require additional support to rectify your conduct. If the aforementioned behavior and performance persists and/or does not improve, it could result in further disciplinary action(s), up to and including dismissal (termination).

(Emphasis in original.)

92.     Greaves's description of Wang's behavior on September 5 and 6, 2013 and her purported "insubordination" and "lack of respect" for her subordinates was inaccurate; and Greaves made the false accusations in retaliation for Wang's complaints about his discriminatory treatment of her.

93.     Greaves's description of Wang's purported "communication" issues and purported failure to "improve" her communication was inaccurate.

94.     Greaves never discussed "communication" with Wang during their one-on-one meeting on July 7, 2013; and Wang's 2013 performance goals did not reference "communications."

95.     Greaves made the false accusations in retaliation for Wang's complaints about his discriminatory treatment of her.

**The CAP contained unreasonable deadlines and was retaliatory; and Greaves refused to clarify some of the tasks outlined in the CAP.**

96.     The CAP issued to Wang on September 11, 2013 outlined goals for her to perform, with the purported overall purpose of improving her performance to the level of "competent."

97.     The CAP period ended on October 10, 2013.

98.     The CAP, in part, alleged that Wang was not effectively communicating.

99.     Greaves and Press issued Wang the CAP at 4:30 p.m. on September 11, 2013, but the first four goals in the CAP, including the communication goal, were due the same day.

100.    When Wang asked for two days to complete these items, Greaves and Press refused and said that the same-day deadline was firm.

101.    The CAP also included several duties which Wang had never previously performed; and the CAP even assigned a task to Wang with a due date in the past.

102.    When WMATA issued the CAP to Wang, her branch was very busy, as it needed to complete WMATA's fiscal year-end close and several time-sensitive audits.

103.    In addition to Wang's usual responsibilities, Wang now had to complete the additional goals outlined in the CAP.

13

104.   As a result, Wang was required to work late into the evening and on weekends.

105.   Several of the performance goals in the CAP required input and clarification from Greaves because they were unclear and unachievable as presented.

106.   On October 7, 2013, Wang again asked Greaves for clarification on those tasks that were newly assigned to her in the CAP.

107.   In an email to Wang on which he copied Press, Audette, and two other WMATA employees, Greaves said, "As a manager, you should also be able to interpret and follow simple instructions. Your constant request for clarification signifies yet another deficiency in deductive reasoning and ability to execute basic tasks."

108.   Wang responded that for the past seven years, WMATA had assigned her specific tasks and Greaves's decision to realign tasks in the CAP required some further clarification.

109.   Wang worked throughout the CAP period to perform all of her duties and to meet the performance goals set in the CAP.

110.   Because of Greaves's treatment, Wang was afraid and offended; and she was embarrassed by Greaves's harsh and unprofessional comments in every weekly CAP review meeting he conducted with Press.

**On September 22, 2013, Wang complained, in writing, to WMATA that the CAP was retaliatory and discriminatory; and she filed an EEOC Charge of discrimination and retaliation on October 2, 2013.**

111.   On September 22, 2013, Wang emailed Coulter in WMATA's OIG and told him that the CAP was "reprisal for speaking with the IG" and that she was "being discriminated against because of [her] age, race and gender."

112.   On October 2, 2013, Wang filed a Charge of Discrimination with the EEOC's Washington Field Office, alleging that WMATA was subjecting her to ongoing discrimination

because of her race and gender, and was retaliating against her for her prior protected activity in opposing the discrimination.

**WMATA, acting through Greaves, terminated Wang before she could complete the CAP.**

113.    On October 10, 2013, Wang arrived at work prepared to submit the final items required for the CAP.

114.    Before Wang could provide the final items to Greaves, Greaves issued Wang a termination letter, effective immediately.

115.    The termination letter presented by Greaves said that WMATA was firing Wang because she had failed to complete the CAP.

116.    The letter, in part, said the following:

> The results of the CAP in summary are as follows: Two of ten deliverables (Items number 1 and 6) met the expected deadline.   One ongoing goal (Item number 2) has not been met. Moreover, all but items 1 and 6 required repeated instruction and direction on how to complete. Additionally, when deliverables were re-submitted for rating, the work products did not meet the requirements.

117.    This summary of the CAP results was both inaccurate and reflective of the unreasonable goals and deadlines included in the CAP because Wang had complained of Greaves's discriminatory treatment of her.

<u>COUNT I</u>
**Discrimination Based on National Origin/Race**
**Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.***

118.    Wang hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

119.    Wang is an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

120.    WMATA is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

121.    WMATA violated 42 U.S.C § 2000e-2 by discriminating against Wang, based on her national origin and race, when it terminated her employment on October 10, 2013.

122.    WMATA, through its employees, unlawfully discriminated against Wang because of her Chinese race and national origin when it falsely claimed that Wang had issues with her communication, and did so because she is not a native English speaker.

123.    WMATA's stated reasons for terminating Wang were pretext for its unlawful race and national origin discrimination.

124.    Wang has exhausted her administrative remedies.

125.    Wang sustained substantial monetary and non-monetary damages as the result of WMATA's illegal conduct.

### COUNT II
**Discrimination Based on Sex**
**Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.***

126.    Wang hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

127.    Wang is an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

128.    WMATA is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

129.    WMATA violated 42 U.S.C § 2000e-2 by discriminating against Wang, based on her sex, when Greaves harshly yelled at and disciplined Wang, and threatened to fire her, for raising her concerns at the September 5, 2013 meeting; and when it terminated her employment on October 10, 2013.

130.    WMATA treated Wang differently than it treated similarly situated male employees, both when Greaves abused Wang when raising in concerns, and when WMATA fired her.

16

131.   WMATA's stated reasons for terminating Wang were pretext for its unlawful gender discrimination.

132.   Wang has exhausted her administrative remedies.

133.   Wang sustained substantial monetary and non-monetary damages as the result of WMATA's illegal conduct.

**COUNT III**
**Retaliation**
**Title VII of Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, *et seq*.**

134.   Wang hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

135.   Wang is an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

136.   WMATA is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

137.   Wang engaged in protected activity under Title VII on several occasions beginning on September 5, 2013, and including the above-referenced communications by Wang on September 5, 6, 11, and 22, 2013.

138.   WMATA violated 42 U.S.C § 2000e-3 by issuing written warnings to Wang because she engaged in protected activity under Title VII when she opposed discriminatory behavior by WMATA.

139.   WMATA violated 42 U.S.C § 2000e-3 by issuing a CAP to Wang because she engaged in protected activity under Title VII when she opposed discriminatory behavior by WMATA.

140.   WMATA violated 42 U.S.C § 2000e-3 by firing Wang because she engaged in protected activity under Title VII when she opposed discriminatory behavior by WMATA.

141.   WMATA's stated reasons for terminating were pretext for its unlawful retaliation.

142.    Wang has exhausted her administrative remedies.

143.    Wang sustained substantial monetary and non-monetary damages as the result of WMATA's illegal conduct.

## PRAYER FOR RELIEF

Based on the foregoing, Wang respectfully requests that she be awarded the following relief against WMATA:

    a.    Reinstatement or, in lieu thereof, full front pay, stock options and benefits;

    b.    Economic damages for lost compensation and damages to Wang's career, reputation, and earning capacity in an amount to be determined at trial but in excess of $10,000;

    c.    Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

    d.    Reasonable costs and experts' and attorneys' fees; and

    e.    Any other such relief that the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

Dated: July 15, 2014                    Respectfully submitted,

_R. Scott Oswald, DC Bar # 458859_
John T. Harrington, DC Bar # 987659
The Employment Law Group, P.C.
888 17th Street, N.W., 9th floor
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
tharrington@employmentlawgroup.com
*Counsel for Plaintiff*