# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMY WANG,                       :

                                :

     Plaintiff,               :

                                :     Civil Action No.:     14-1189 (RC)

     v.                     :

                                :     Re Document No.:     19

WASHINGTON METROPOLITAN AREA  :

TRANSIT AUTHORITY,           :

                                :

     Defendant.             :

## <u>MEMORANDUM OPINION</u>

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Citing acts of insubordination and communication issues, Defendant Washington Metropolitan Area Transit Authority (WMATA) placed its former Financial Control Manager, Plaintiff Amy Wang, on a thirty-day corrective action plan. After Ms. Wang's supervisor found Ms. Wang's performance on the corrective action plan unacceptable, WMATA terminated Ms. Wang's employment.

This suit followed. Ms. Wang alleges that WMATA violated Title VII of the Civil Rights Act of 1964 by discriminating against her based on her national origin, race, and sex, and by retaliating against her in response to her opposition to those discriminatory acts. Ms. Wang also alleges that WMATA retaliated against her in response to her whistleblowing in relation to federal funds WMATA received under the American Recovery and Reinvestment Act of 2009 (ARRA).

WMATA now moves for summary judgment. On the record the parties present, a reasonable jury could find that WMATA's reasons for terminating Ms. Wang are a pretextual

cover for discrimination. A reasonable jury could alternatively find that WMATA terminated

Ms. Wang as retaliation for her opposition to what she reasonably perceived to be WMATA's

discrimination. The Court therefore declines to grant summary judgment on Ms. Wang's Title

VII claims. But, because Ms. Wang has not established that she made a disclosure that the

ARRA's whistleblower provision protects, the Court will grant WMATA's motion for summary

judgment on Ms. Wang's ARRA retaliation claim.

## II. BACKGROUND[1]

### A. Ms. Wang's First Two Years at WMATA (2006–2008)

Defendant WMATA provides transit services in the Washington, D.C. metropolitan area.

Am. Compl. ¶ 20, ECF No. 9; Answer Am. Compl. ¶ 20, ECF No. 10.[2] On May 22, 2006,

---

[1] Unless otherwise noted, this section recounts only facts that the parties do not dispute or facts substantiated by the record. *See* Answer Am. Compl., ECF No. 10 (admitting some of Ms. Wang's allegations in her amended complaint); Pl.'s Statement of Material Facts in Dispute 1–5, ECF No. 20-1 [hereinafter Pl.'s Statement] (agreeing that certain facts, which WMATA listed in its statement of undisputed facts, are undisputed); *id.* at 5–8 (listing additional undisputed facts); Def.'s Resp. Pl.'s Statement, ECF No. 21-1 [hereinafter Def.'s Resp. Statement] (declining to dispute Ms. Wang's additional undisputed facts, and admitting or declining to dispute some of the facts Ms. Wang asserted are disputed).

[2] Ms. Wang filed an amended complaint on January 13, 2015—six months after she filed her initial complaint on July 15, 2014, and five months after WMATA filed its answer on August 7, 2014. *See* Am. Compl. 28 (dated January 13, 2015); Answer 15, ECF No. 4 (dated August 7, 2014); Compl. 19, ECF No. 1 (dated July 15, 2014). Because Ms. Wang filed her amended complaint outside of the time period in which she could have amended her complaint as a matter of course, *see* Fed. R. Civ. P. 15(a)(1) (allowing parties to amend their pleadings within twenty-one days of serving them, or within twenty-one days after service of a responsive pleading or certain responsive motions), she should have either sought the Court's leave to amend her complaint or provided proof of WMATA's written consent, *see* Fed. R. Civ. P. 15(a)(2). *See also* Scheduling Order, ECF No. 6 (declaring that "any party proposing amendments to the pleadings *must seek leave* to do so" by January 15, 2015 (emphasis added)).

Even though Ms. Wang did not strictly comply with Rule 15's requirements, WMATA has implicitly consented to Ms. Wang's amended complaint by failing to object to it, answering it, and addressing its claims in its motion for summary judgment. *See* Answer Am. Compl. 1–19; Def.'s Mem. P. & A. Supp. Mot. Summ. J. 6–38, ECF No. 19 [hereinafter Def.'s Mem.]. The

Plaintiff Amy Wang, a Chinese-American female, began working as the Financial Control Manager in WMATA's Office of Accounting. Am. Compl. ¶¶ 2, 30; Answer Am. Compl. ¶¶ 2, 30; Statement of Material Facts Not in Dispute ¶ 1, ECF No. 19-2 [hereinafter Def.'s Statement]; Pl.'s Statement of Material Facts in Dispute 1, ¶ 1, ECF No. 20-1 [hereinafter Pl.'s Statement].[3] As WMATA's Financial Control Manager, Ms. Wang's responsibilities included managing WMATA's General Ledger and WMATA's Accounts Receivable group. Def.'s Statement ¶ 2; Pl.'s Statement 2, ¶ 2. She also supervised several employees. Def.'s Statement ¶ 2; Pl.'s Statement 2, ¶ 2. During Ms. Wang's first two years at WMATA, Ms. Wang reported to Kathleen Smith, WMATA's Comptroller, until Ms. Smith left WMATA in January 2008. Pl.'s Statement 5–6, ¶¶ 42, 45; *accord* Audette Dep. 17:12–18:8, Pl.'s Statement Ex. 2, ECF No. 20-4. Between January 2008 and October 2008, Ms. Wang reported to Fawzia Hafeez, WMATA's Acting Comptroller. Pl.'s Statement 5–6, ¶ 45; *accord* Audette Dep. 18:4–15.

### B.  Ms. Wang's Years Under Ms. Audette's Supervision (2008–2012)

1.  Performance Evaluations and Corrective Action Plan

In October 2008, Stephanie Audette became WMATA's Comptroller and Ms. Wang's direct supervisor. Def.'s Statement ¶ 8; Pl.'s Statement 2, ¶ 5. Ms. Audette remained Ms. Wang's direct supervisor until August 2012. Pl.'s Statement 5, ¶ 42; *accord* Audette Dep. 16:22–17:3.

---

Court therefore considers Ms. Wang's amended complaint to be the complaint currently governing this case.

[3] Even though Ms. Wang's name sometimes appears in the record as "Huiling Wang," *see, e.g.*, Pl.'s Statement Ex. 13, ECF No. 20-15 (reproducing a performance evaluation for work performed between May 15, 2006 and May 15, 2007, in which Ms. Wang's name appears as "Huiling Wang"), both the parties refer to Ms. Wang as "Amy Wang." *See* Def.'s Statement ¶ 1; Pl.'s Statement 1, ¶ 1. Ms. Wang stated in her deposition that her first name was "Huiling" before she was naturalized and became an American citizen, that she was known by the first name "Amy" even before she was naturalized, and that "Huiling" became her middle name after she was naturalized. Wang Dep. 13:20–14:20, Pl.'s Statement Ex. 1, ECF No. 20-3.

Between October 2008 and August 2012, Ms. Audette prepared Ms. Wang's yearly performance evaluations. Pl.'s Statement 5, ¶¶ 43–44; *accord* Audette Dep. 16:22–17:6.

Ms. Wang received her 2009 performance evaluation from Ms. Audette on September 9, 2009. Def.'s Statement ¶ 8; Pl.'s Statement 2, ¶ 5. In that evaluation, Ms. Audette gave Ms. Wang a "Needs Improvement" rating in ten of the thirteen categories in the evaluation. Def.'s Statement ¶ 8; Pl.'s Statement 2, ¶ 5. Ms. Audette accordingly placed Ms. Wang on a corrective action plan, in which Ms. Wang received three and a half months to meet the goals specified in the plan. Def.'s Statement ¶ 8; Pl.'s Statement 2, ¶ 5; *id.* at 19, ¶ 3; Def.'s Resp. Pl.'s Statement 7, ¶ 3, ECF No. 21-1 [hereinafter Def.'s Resp. Statement]. Ms. Wang successfully completed the tasks specified in the plan. Pl.'s Statement 19, ¶ 4; Def.'s Resp. Statement 7, ¶¶ 2, 4. Ms. Wang received a satisfactory performance evaluation in 2010, and she received a "competent" or "exceeds expectations" rating for each metric in her 2011 and 2012 performance evaluations. Am. Compl. ¶ 38; Answer Am. Compl. ¶ 38; Pl.'s Statement 14, ¶ 25; Def.'s Resp. Statement 5, ¶ 24.

## 2. IFO Project

In 2010, while Ms. Audette was Ms. Wang's supervisor, WMATA began work with a contractor named Metaformers on a project titled the PeopleSoft Integrated Finance Organization Project, or the "IFO Project." Am. Compl. ¶¶ 50, 54 (indicating that WMATA awarded Metaformers the contract for the IFO Project in July 2010); Answer Am. Compl. ¶¶ 50, 54 (same); Pl.'s Statement 5, ¶ 43 (indicating that Ms. Audette was Ms. Wang's supervisor in 2010); Audette Dep. 16:22–17:3 (same). Supported by about five million dollars in federal stimulus funds, the IFO Project sought to upgrade, restructure, and bring new modules into the PeopleSoft Enterprise software that WMATA's financial departments used. Def.'s Statement

¶ 75; Pl.'s Statement 4, ¶ 24; *id.* at 55–56, ¶¶ 1–2; Def.'s Resp. Statement 15, ¶¶ 1–2. One of the IFO Project's major goals was to eliminate manual communication between different modules by allowing the modules to be integrated together. Def.'s Statement ¶ 79; Pl.'s Statement 4, ¶ 28. To that end, for instance, the IFO Project integrated WMATA's Project Costing accounting system with WMATA's PeopleSoft Financial system. Am. Compl. ¶ 113; Answer Am. Compl. ¶ 113.

The IFO Project proceeded in stages: a design phase came first, followed by a testing phase, then an implementation phase, and finally a maintenance phase. Def.'s Statement ¶ 76; Pl.'s Statement 4, ¶ 25. During the course of the project, a "Project Team" of WMATA employees ("leads") worked full-time on the IFO Project alongside Metaformers. Def.'s Statement ¶ 77; Pl.'s Statement 4, ¶ 26. But regardless of WMATA employees' Project Team membership, WMATA required everyone in its Office of Accounting to contribute to the IFO Project. Def.'s Statement ¶ 78; Pl.'s Statement 4, ¶ 27. Thus, although Ms. Wang and her staff were not Project Team members, they were "subject-matter experts" for IFO Project purposes, because they used the modules that the IFO Project upgraded. Def.'s Statement ¶ 77; Pl.'s Statement 4, ¶ 26.

While work for the IFO Project was ongoing, it was Ms. Wang's group's top priority. Pl.'s Statement 57, ¶ 13; Def.'s Resp. Statement 16, ¶ 13. Ms. Wang helped the Project Team with the design and testing for software used in Ms. Wang's areas of responsibility. Pl.'s Statement 57, ¶ 11; Def.'s Resp. Statement 16, ¶ 11. For instance, during the testing phase, Metaformers would produce testing kits, and Ms. Wang would organize her staff so that affected staff members could use the kits to test affected modules. Def.'s Statement ¶ 80; Pl.'s Statement 4, ¶ 29. Because she did not believe she could do all the testing herself, Ms. Wang relied on her staff to test the modules: she assigned testing tasks and monitored her staff's performance and

completion of the tasks. Def.'s Statement ¶ 80; Pl.'s Statement 4, ¶ 29; *id.* at 57–58, ¶ 14; Def.'s Resp. Statement 16, ¶ 14. Throughout the IFO Project, at the end of each accounting period, Ms. Wang was responsible for ensuring that all accounts' transactions were properly completed, and that fiscal years and accounting periods closed in a timely manner. Am. Compl. ¶ 94; Answer Am. Compl. ¶ 94.

As the IFO Project went on, however, extensive data issues arose that required manual interventions, data deletions, and data corrections. Am. Compl. ¶ 109, Answer Am. Compl. ¶ 109. In September 2012, for instance, the IFO Project created a $26 million erroneous billing entry, which Ms. Audette asked Ms. Wang to correct. Pl.'s Statement 60, ¶ 28; Def.'s Resp. Statement 17, ¶ 28 (declining to dispute this fact). After Ms. Wang refused to correct the entry because she claimed that she lacked supporting documentation for the correction, Ms. Audette asked one of Ms. Wang's staff members to correct the entry, because Ms. Audette believed that the correction did have supporting documentation. Pl.'s Statement 60, ¶¶ 28–29; Def.'s Resp. Statement 17, ¶¶ 28–29.

Ms. Wang raised issues with the IFO Project's implementation in emails to Ms. Audette and others in October 2011, in a meeting in November 2011, and in an email in July 2012. Pl.'s Statement 58–60, ¶¶ 19, 25; Def.'s Resp. Statement 16–17, ¶¶ 19, 25. The issues meant that WMATA never completed a design that allowed automated integration of assets. Pl.'s Statement 62, ¶ 35; Def.'s Resp. Statement 17, ¶ 35. By July 2012, the issues were well-known and widely discussed. Def.'s Statement ¶ 95; Pl.'s Statement 5, ¶ 35. Despite the group efforts taken to resolve the issues, they persisted for years after the upgraded software's implementation. Am. Compl. ¶ 118; Answer Am. Compl. ¶ 118; Pl.'s Statement 57, ¶ 9; Def.'s Resp. Statement 15, ¶ 9.

**C. Ms. Wang's Year Under Mr. Greaves's Supervision (2012–2013)**

1. Supervisory Structure

In August 2012, WMATA hired Ian Greaves to become its Assistant Comptroller, a newly created position that reported to Ms. Audette. Def.'s Statement ¶ 11; Pl.'s Statement 2, ¶ 6; *id.* at 6, ¶ 49; *see also* Greaves Dep. 15:3–5, Pl.'s Statement Ex. 3, ECF No. 20-5 (noting that Ms. Audette was Mr. Greaves's supervisor). Mr. Greaves became Ms. Wang's direct supervisor, as well as the supervisor for WMATA employees in five other positions in the Office of Accounting: (1) Jessie Li, the Accounts Payable Manager;[4] (2) Colleen Clancy, the Asset Management Supervisor; (3) the Financial System Manager, a position that was vacant at the time; (4) Fawzia Hafeez, the Financial Analysis Manager; and (5) Jamette Williams, the Project Costing Manager. Def.'s Statement ¶¶ 11–12; Pl.'s Statement 2, ¶¶ 6–7; *id.* at 6–7, ¶¶ 53, 56; *see also* Greaves Dep. 18:18–21:7 (noting the various employees that reported to Mr. Greaves). Of the five managers reporting to Mr. Greaves in 2012, at least four were women. Def.'s Statement ¶ 12; Pl.'s Statement 2, ¶ 7. Ms. Li, like Ms. Wang, was Chinese-American and was not a native English speaker. Def.'s Statement ¶ 12; Pl.'s Statement 2, ¶ 7. And Ms. Hafeez was not born in the United States. Def.'s Statement ¶ 12; Pl.'s Statement 2, ¶ 7.

When Mr. Greaves became Ms. Wang's supervisor, Ms. Wang herself supervised three employees: (1) Shawn Brown, the General Ledger Supervisor; (2) Dale Dixon, the Accounts Receivable Supervisor; and (3) Francisco Julia, a Financial Analyst. Pl.'s Statement 7, ¶ 58;

---

[4] Although Ms. Li's legal name appears to be "Litien Li," the parties and WMATA employees refer to Ms. Li by the first name that she adopted, "Jessie." *See* Def.'s Statement ¶ 12; Pl.'s Statement 2, ¶ 9; Li Dep. 6:8–6:12, Pl.'s Statement Ex. 5, ECF No. 20-7 ("My name is Litien Li. You can call me Jessie."). The Court does the same.

*accord* Greaves Dep. 39:8–40:6. Ms. Brown was an African-American woman. Pl.'s Statement 44, ¶ 3; Def.'s Resp. Statement 12–13, "Page 44 of 63," ¶ 3.

### 2. Performance Evaluation

On February 1, 2013, Mr. Greaves issued Ms. Wang her 2012 performance evaluation. Am. Compl. ¶ 46; Answer Am. Compl. ¶ 46. Ms. Wang received a "competent" rating in many areas, including interpersonal skills, and an "exceeds expectations" rating for customer focus, decisionmaking, and innovation. Am. Compl. ¶¶ 47–48; Answer Am. Compl. ¶¶ 47–48. Because Mr. Greaves had only recently joined WMATA, the performance evaluation included comments from both Ms. Audette and Mr. Greaves. Def.'s Statement ¶¶ 27–28; Pl.'s Statement 2–3; ¶¶ 10–11. Ms. Audette noted that Ms. Wang needed to continue to improve her communication skills, and that Ms. Wang "ha[d] good ideas but need[ed] to make them clear to her team and peers." Def.'s Statement ¶ 28; Pl.'s Statement 3, ¶ 11. Mr. Greaves's sole comment on Ms. Wang's evaluation stated that

> Amy is cooperative and willing to work with new management. Amy can continue to improve her performance by administering appropriate review of all journal entries to ensure transactions are accurate and properly supported. Amy should also seek to broaden her knowledge of the basic financial statements. Finally, Amy needs to make an avid effort to enhance her communication skills.

Def.'s Statement Ex. 9, at 280, ECF No. 19-11 (reproducing Ms. Wang's performance evaluation); *accord* Def.'s Statement ¶ 27; Pl.'s Statement 2, ¶ 10; *id.* at 16, ¶ 35; Def.'s Resp. Statement 5, ¶ 35.

### 3. IFO Project

Mr. Greaves and Ms. Wang had one discussion about IFO Project issues relating to WMATA's Asset Management module. Def.'s Statement ¶ 92; Pl.'s Statement 4, ¶ 33. In July 2013, Ms. Wang alerted Mr. Greaves to instances in which software improperly "pulled" data from WMATA's operating inventory expense account, instead of from WMATA's capital

transactions account, into the Asset Management module. Pl.'s Statement 59, ¶ 20; Def.'s Resp. Statement 16, ¶ 20. Ms. Wang created a spreadsheet with short-term and long-term items, including additional staff training, that she thought would address the problems. Pl.'s Statement 59, ¶ 20; Def.'s Resp. Statement 16, ¶ 20. Ms. Wang gave her list of solutions to Mr. Greaves, and Mr. Greaves gave that list to one of the IFO Project Team leads. Def.'s Statement ¶¶ 92–93; Pl.'s Statement 4–5, ¶¶ 33–34.

### D. Events Leading to Ms. Wang's Termination

#### 1. Meeting About Mr. Julia's Transfer (September 5, 2013)

Until September 5, 2013, Ms. Wang described her relationship with Mr. Greaves as "fine" and "okay." Def.'s Statement ¶ 16; Pl.'s Statement 2, ¶ 8. On September 5, Mr. Greaves held a meeting with Ms. Wang, the Financial Control Manager; Ms. Li, the Accounts Payable Manager; Mr. Dixon, the Accounts Receivable Supervisor; and Mr. Julia, the Financial Analyst who reported to Ms. Wang. Am. Compl. ¶ 121; Answer Am. Compl. ¶ 121. At the meeting, Mr. Greaves issued a "directive to allocate the duties currently performed by Francisco [Julia] to the Accounts Receivable (AR) staff." Am. Compl. ¶ 140 (reproducing Mr. Greaves's written account of what transpired at the meeting); Answer Am. Compl. ¶ 140 (admitting that the text reflects Mr. Greaves's written account). Although the parties dispute what else occurred during that meeting, they do not dispute that, after the meeting and on that same day, Mr. Greaves prepared a written warning to give to Ms. Wang. Def.'s Statement ¶ 32; Pl.'s Statement 3, ¶ 12; *cf., e.g.*, Def.'s Statement ¶ 30 (alleging that "Ms. Wang yelled, interrupted, and shouted" during the meeting); Pl.'s Statement 21–22, ¶¶ 3–4 (alleging that Ms. Wang "did not raise her voice and was not disrespectful or insubordinate," and that Mr. Greaves "was angry and did not want to listen to" Ms. Wang's concerns).

The record shows that Ms. Wang emailed Ms. Audette at 3:57 PM on September 5, 2013 after the meeting with Mr. Greaves. *See* Pl.'s Statement Ex. 17, ECF No. 20-19 (reproducing the email); *accord* Am. Compl. ¶ 134. In her email, Ms. Wang stated that Mr. Greaves "called a meeting and told [Ms. Wang] that he was taking [Mr. Julia]" and moving him to another WMATA component, and so Ms. Wang "would have to assume all of [Mr. Julia's] responsibilities." Pl.'s Statement Ex. 17. Ms. Wang further stated that "[she] felt that [she was] being taken advantage of because [she does] not complain and just get[s] the job done." *Id.* She concluded by stating that "[she was] not sure about [her] next step," but hoped to discuss the matter with Ms. Audette at Ms. Audette's convenience. *Id.*

The record further shows that, within an hour of when Ms. Wang sent her email to Ms. Audette, Mr. Greaves learned about Ms. Wang's September 5 email because Ms. Audette had forwarded the email to Mr. Greaves. *See* Def.'s Statement Ex. 12/13, at 488–89, ECF No. 19-14 (showing that Ms. Audette forwarded Ms. Wang's email to Mr. Greaves at 4:31 PM, and that Mr. Greaves replied to Ms. Audette at 4:43 PM). In Mr. Greaves's 4:43 PM reply to Ms. Audette, sent immediately after he received a copy of Ms. Wang's email, Mr. Greaves alleged that Ms. Wang was "mischaracterizing the event in an attempt to create a case." *Id.* at 488. Mr. Greaves replied to Ms. Audette's email once more that day at 6:20 PM. *See id.* at 487–88. In his second reply, Mr. Greaves provided six enumerated responses to what he characterized as Ms. Wang's "allegations." *Id.* As one of his responses, he wrote to Ms. Audette that "[s]aying words like angrily, abruptly, and advantage as you know are words Amy [Wang] is documenting to develop a case." *Id.* at 488.

## 2.  First Written Warning (September 6, 2013)

The next day, Mr. Greaves and Ms. Wang argued about another issue: whether to train

Mr. Dixon (in addition to Ms. Wang's other supervisee, Ms. Brown) about the month-end

closing process. Pl.'s Statement 25–26, ¶ 1; Def.'s Resp. Statement 8–9, "Page 25 of 63," ¶ 1. On

September 6, Mr. Greaves also delivered to Ms. Wang the written warning he had prepared the

day before. Def.'s Statement ¶ 32; Pl.'s Statement 3, ¶ 12. The warning, reproduced in full

below, stated that Ms. Wang had been insubordinate in the meeting held on September 5, 2013:

> This memo is to issue a disciplinary warning as a result of an act of
> insubordination you committed on September 5, 2013 . . . during a department
> planning meeting that was conducted in my office. The meeting participants were
> Francisco Julia, Jessie Li, Dale Dixon, Amy Wang (you), and Ian Greaves (me).
>
> You disagreed with my directive to allocate the duties currently performed by
> Francisco to the Accounts Receivable (AR) staff, thereby realigning the AR
> branch responsibilities. In addition to emphatically defying a directive, you
> ignored multiple verbal warnings and continuously interrupted the discussion. I
> attempted to give you a more confidential setting to express your concerns by
> dismissing the staff and inviting only Tywanda Diggs to the meeting. Yet, you
> continued to disrupt that session as well.
>
> Your behavior as a manager in the presence of peers and your subordinates was
> unprofessional. As a manager, you are in a trusted position where a higher level of
> accountability is expected of you to conduct yourself as a professional and serve
> as a role model for your subordinates.
>
> Further displays of insubordinate behavior will not be tolerated and can result in
> further disciplinary action up to and including termination, Metro/Policy
> Instruction 7.8.5, Disciplinary Actions.
>
> Again, please provide the realignment of duties as requested by 5:00 PM Friday,
> September 13, 2013.

Def.'s Statement Ex. 11, ECF No. 19-13.

The parties agree that the written warning neither terminated Ms. Wang's employment

nor changed her benefits, salary, or title. Def.'s Statement ¶¶ 34, 43; Pl.'s Statement 3, ¶¶ 13, 15.

During the encounter between Mr. Greaves and Ms. Wang, however, Ms. Wang had the

impression of being terminated. Pl.'s Statement 26–27, ¶ 3; Def.'s Resp. Statement 8–9, "Page 25 of 63," ¶ 3. Specifically, Ms. Wang alleges that, during their September 6 conversation, (1) Mr. Greaves began to "yell and scream"; (2) Ms. Wang told him that, because of his yelling and screaming, Mr. Greaves "seem[ed] to abuse [his] authority"; (3) Mr. Greaves replied that "[a]buse would be a word you would tell a lawyer"; (4) Ms. Wang replied "[m]aybe"; and (5) Mr. Greaves became very excited, pointed his finger to Ms. Wang's nose, and said "You're fired. You're fired. You're fired immediately." Wang Dep. 194:3–7, 206:2–6, 212:10–214:20, Pl.'s Statement Ex. 1, ECF No. 20-3. Mr. Greaves admits that Ms. Wang may have mentioned that she might retain an attorney, but he generally disagrees with Ms. Wang's version of events and contends that he has never yelled at Ms. Wang. Greaves Dep. 147:16–150:18, Pl.'s Statement Ex. 3, ECF No. 20-5.

Thomas Vu, a WMATA employee who had an office adjacent to Ms. Wang's, recalls an occasion "early in the morning," about two weeks before WMATA fired Ms. Wang, when Mr. Vu "heard a lot of shouting and voice raising" coming from Ms. Wang's office, as well as Mr. Greaves saying "You're fired" and "You're fired immediately." Pl.'s Statement 27–28, ¶¶ 5–8; Def.'s Resp. Statement 9, ¶¶ 5–8. Mr. Vu also recalled that Ms. Wang responded by saying "This is not professional" in a lower tone. Pl.'s Statement 27–28, ¶¶ 5–6; Def.'s Resp. Statement 9, ¶¶ 5–6.

### 3. First OIG Visit (September 6, 2013)

After the encounter in which Ms. Wang received the written warning from Mr. Greaves, Ms. Wang went to WMATA's Office of the Inspector General (OIG). Def.'s Statement ¶ 35; Pl.'s Statement 3, ¶ 14; *id.* at 30, ¶ 1; Def.'s Resp. Statement 9, "Page 30 of 63," ¶ 1. Ms. Wang sought out the OIG because she thought that the OIG was "in charge of abuse" and that

Mr. Greaves had been harassing her. Pl.'s Statement 30, ¶ 1; Def.'s Resp. Statement 9, "Page 30 of 63," ¶ 1. At the OIG, Ms. Wang reported that her supervisor had "yelled and screamed" at her and that she was scared. Pl.'s Statement 30, ¶ 1; Def.'s Resp. Statement 9, "Page 30 of 63," ¶ 1. In an interview with OIG Special Agent Mark Coulter, Ms. Wang explained what had happened between Mr. Greaves and herself, beginning with the meeting when Mr. Greaves announced the plan to move Mr. Julia. Pl.'s Statement 30–31, ¶¶ 2, 4; Def.'s Resp. Statement 9, "Page 30 of 63," ¶¶ 1–2, 4. *See generally* Def.'s Statement Ex. 15 (reproducing the audio file from Special Agent Coulter's interview with Ms. Wang). Ms. Wang told Special Agent Coulter that, in the face of the disagreement between Mr. Greaves and Ms. Wang, Mr. Greaves's immediate response was to tell Ms. Wang "You're fired." Pl.'s Statement 31, ¶ 6; Def.'s Resp. Statement 9–10, "Page 30 of 63," ¶¶ 1, 6. Ms. Wang also told Special Agent Coulter that she thought Mr. Greaves was treating her unfairly, that she had unsuccessfully tried to meet with Ms. Audette, and that overall she "was very unhappy in how she had been treated." Pl.'s Statement 31–32, ¶¶ 3, 7; Def.'s Resp. Statement 9–10, "Page 30 of 63," ¶¶ 1, 3, 7.

In response, Special Agent Coulter explained to Ms. Wang that, for terminations of employment, WMATA had specific procedures, which Mr. Greaves did not appear to have followed. Pl.'s Statement 31, ¶ 4; Def.'s Resp. Statement 9, "Page 30 of 63," ¶¶ 1, 4. Thus, Special Agent Coulter advised Ms. Wang to stay at WMATA for the time being. Pl.'s Statement 30, ¶ 1; Def.'s Resp. Statement 9, "Page 30 of 63," ¶ 1. Special Agent Coulter also told Ms. Wang that he would report the matter to his boss and that the OIG would investigate the incident. Pl.'s Statement 30, ¶ 1; *id.* at 31, ¶ 4; Def.'s Resp. Statement 9, "Page 30 of 63," ¶¶ 1, 4. After her interview with Special Agent Coulter, Ms. Wang emailed Special Agent Coulter and

asked him to provide her with the contact information for WMATA's "EEO office." Def.'s

Statement Ex. 18, ECF No. 19-18 (reproducing Ms. Wang's email to Special Agent Coulter).

### 4. Communications with Ms. Audette and Mr. Greaves After First OIG Visit

When Ms. Wang returned to her office after speaking with Special Agent Coulter at the

OIG, she saw a note from Mr. Greaves. Pl.'s Statement 32–33, ¶ 12; Def.'s Resp. Statement 10,

¶ 12. The note requested that Ms. Wang meet with Mr. Greaves and Ms. Audette before leaving

the office for the day. Pl.'s Statement 33, ¶ 14; Def.'s Resp. Statement 10, ¶ 14. Mr. Greaves had

also sent Ms. Wang an email, in which he stated that he and Ms. Audette wanted to "review

expectations" with Ms. Wang, and that Ms. Wang would still be expected to report to work the

following Monday. Pl.'s Statement 33, ¶ 14; Def.'s Resp. Statement 10, ¶ 14.

Mr. Greaves then came to Ms. Wang's office, escorted Ms. Wang to Ms. Audette's

office, and left the two in Ms. Audette's office. Pl.'s Statement 33, ¶ 14; Def.'s Resp. Statement

10, ¶ 14. There, Ms. Wang told Ms. Audette that she was scared, threatened, and insulted by

Mr. Greaves's behavior. Pl.'s Statement 33, ¶ 14; Def.'s Resp. Statement 10, ¶ 14. Ms. Wang

also told Ms. Audette that she had reported Mr. Greaves's behavior to the OIG. Pl.'s Statement

33, ¶ 14; Def.'s Resp. Statement 10, ¶ 14.

At some point later, Mr. Greaves heard a rumor that Ms. Wang may have complained to

the OIG or WMATA's human resources department. Pl.'s Statement 42, ¶ 1; *id.* at 43, ¶ 4; Def.'s

Resp. Statement 12, "Page 42 of 63," ¶¶ 1, 4. Meanwhile, in emails on September 9, 2013,

Mr. Greaves and Ms. Wang continued to argue about whether Ms. Wang should train Mr. Dixon

to perform the month-end closing process. Pl.'s Statement 34–35, ¶¶ 1–3; Def.'s Resp. Statement

10, "Page 34 of 63," ¶¶ 1–3.

5. Visit to WMATA's Office of Civil Rights and Human Resources (September 11, 2013)

On September 11, 2013, Ms. Wang visited WMATA's Office of Civil Rights and Human Resources. Def.'s Statement ¶ 49; Pl.'s Statement 3, ¶ 18. At the time, Lisa Johnson worked in the Equal Employment Opportunity (EEO) Division of that office as an EEO Assistant/Coordinator. Def.'s Statement ¶ 50; Pl.'s Statement 3, ¶ 19. Ms. Johnson was responsible for handling complaints involving discrimination claims; no one else in the EEO Division had those duties and responsibilities. Def.'s Statement ¶ 50; Pl.'s Statement 3, ¶ 19; *id.* at 38, ¶ 11; Def.'s Resp. Statement 11, ¶ 11.

The parties dispute what happened during Ms. Wang's visit to the Office of Civil Rights and Human Resources: Ms. Wang alleges that she spoke first with Ms. Johnson, that Ms. Johnson said that a woman named Belinda Press would speak with Ms. Wang, that Ms. Wang told both Ms. Johnson and Ms. Press that she had come to file a discrimination complaint against Mr. Greaves, and that Ms. Press told Ms. Wang that Ms. Press would call Ms. Wang later to obtain the details of her complaint. *See* Pl.'s Statement 35–36, ¶¶ 2–3. WMATA disputes this version of events and contends that Ms. Press, as an Employee Relations Officer, would not have handled equal employment opportunity issues, but instead would have handled "discipline matters, performance issue matters, [and] peer-to-peer conflict issues." Def.'s Statement ¶ 51; *see also* Def.'s Resp. Statement 10, "Page 35 of 63," ¶¶ 2–3 (disputing Ms. Wang's version of events). But the parties do agree that, after the visit, Ms. Wang's communications with the Office of Civil Rights and Human Resources were through Ms. Press. Def.'s Statement ¶¶ 53–56; Pl.'s Statement 3, ¶ 20; *id.* at 39, ¶¶ 14–15; Def.'s Resp. Statement 11, ¶¶ 14–15.

Ms. Press was one of three Employee Relations Officers in WMATA's Office of Civil Rights and Human Resources. Pl.'s Statement 8, ¶ 72; *accord* Press Dep. 11:13–12:6, Pl.'s Statement Ex. 9, ECF No. 20-11. After Ms. Wang visited WMATA's Office of Civil Rights and Human Resources on September 11, 2013, Ms. Wang and Ms. Press exchanged emails that same day. Pl.'s Statement 39, ¶ 14; Def.'s Resp. Statement 11, ¶ 14. Their email exchange that day ended with an email from Ms. Wang to Ms. Press, in which Ms. Wang sought to describe what had happened between Ms. Wang and Mr. Greaves: "I am able to give you the timelines now so you can see what happened, briefly. Please see the attachment. I am also attaching the desk duties of my staff that Ian [Greaves] wants to take away from my group. Thanks." Pl.'s Statement 39, ¶ 14; Def.'s Resp. Statement 11, ¶ 14. Ms. Wang's email listed attachments titled "Timelines.docx" and "Desk Procedures - Detailed - Francisco Julia.docx," which provided a timeline of Ms. Wang's interactions with Mr. Greaves between September 5, 2013 and September 9, 2013, as well as a description of Mr. Julia's duties. Pl.'s Statement 39, ¶ 15; Def.'s Resp. Statement 11, ¶ 15; *see also* Pl.'s Statement Ex. 22, ECF No. 20-24 (reproducing Ms. Wang's email and the accompanying attachments). Ms. Wang and Ms. Press also had one conversation by phone. Def.'s Statement ¶ 53; Pl.'s Statement 3, ¶ 20.

6.   Second Written Warning and Corrective Action Plan (September 11, 2013)

On September 11, 2013, the same day as Ms. Wang's visit to WMATA's Office of Civil Rights and Human Resources, Ms. Wang received a second written warning from Mr. Greaves. Def.'s Statement ¶ 47; Pl.'s Statement 3, ¶ 16. The second warning, reproduced in full below, addressed Mr. Greaves and Ms. Wang's September 6, 2013 encounter, Ms. Wang's communication skills, and Ms. Wang's performance issues:

This memo serves as a **<u>written warning</u>** for professional misconduct and performance regarding behaviors you exhibited on Friday, September 6, 2013 as well as on-going lack of follow-up on action items requested by management.

At about 9 AM on Friday, September 6, 2013, I attempted to give you a verbal and written warning for your insubordinate behavior during a staff meeting on Thursday, September 5, 2013. Your actions during and following my attempt to issue that warning clearly demonstrated to me that you had no remorse for your behavior. You continuously talked while I was speaking to you and refused to stop when I asked you to do so. This confirmed your lack of regard and respect for me and my office.

Later that morning you had an opportunity to speak with Stephanie [Audette] and me in my office, and yet again, you continuously interrupted me while I attempted to discuss expectations for you to train your supervisors on month-end closing procedures.

As part of your 2013 performance goals, I requested that you take action to improve your communication. Since the issuance of your 2013 goals, we have had more than one meeting (i.e. June 7, 2013 1-n-1 and Feb 1, 2013 goals discussion) in which I reiterated your need to fulfill this goal. As a manager you are expected to communicate effectively and properly to everyone including all WMATA personnel and business partners. I noted this in your 2012 annual performance review and your 2013 performance goals.

To date you have made no progress as indicated by your email correspondence and discussions with me. Moreover, you do not display a willingness to make any improvement. Your insubordination to me and your lack of respect for your own subordinates (as indicated by your emails to your staff) substantiate this observation.

These behaviors cannot be tolerated and once again, this memo is to inform you that you are being placed on verbal and written warning. Over the next 30 days, I will review and evaluate your behavior in this manner. I will also work with you if you require additional support to rectify your conduct. If the aforementioned behavior and performance persists and/or does not improve, it could result in further disciplinary action(s), up to and including dismissal (termination).

Def.'s Statement Ex. 16, ECF No. 19-16. This warning, like the first warning, did not change

Ms. Wang's benefits, salary, or title. Def.'s Statement ¶¶ 47–48; Pl.'s Statement 3, ¶¶ 16–17.

As prefaced in the warning, Mr. Greaves placed Ms. Wang on a thirty-day corrective

action plan at the same meeting in which he issued the warning. Pl.'s Statement 40, ¶ 18; Def.'s

Resp. Statement 11, ¶ 18; *see also* Def.'s Statement ¶ 64 (indicating that the plan lasted thirty

days); Pl.'s Statement 3, ¶ 22 (same). *See generally* Def.'s Statement Ex. 20, ECF No. 19-20

(reproducing the corrective action plan). The plan outlined goals for Ms. Wang to perform, with

the purported overall purpose of improving her performance so that it would become

"competent." Am. Compl. ¶ 173; Answer Am. Compl. ¶ 173.

### 7. OIG Communications and Second OIG Visit (September 22–24, 2013)

On September 22, 2013, during the thirty-day corrective action plan period, Ms. Wang

emailed Special Agent Coulter in WMATA's OIG about her situation. Pl.'s Statement 41, ¶ 1;

Def.'s Resp. Statement 11, ¶ 1. Ms. Wang told Special Agent Coulter that she had been placed

on a corrective action plan after telling Ms. Audette that she had complained to the OIG. Pl.'s

Statement 41, ¶ 2; Def.'s Resp. Statement 11, ¶ 2. She also told Special Agent Coulter that the

corrective action plan was "reprisal for speaking with the [O]IG" and that she was "being

discriminated against because of [her] age, race and gender." Pl.'s Statement 41, ¶ 1; Def.'s

Resp. Statement 11, ¶ 1.

In response, Special Agent Coulter told Ms. Wang to seek outside counsel, and

Ms. Wang responded that she had already hired an attorney. Pl.'s Statement 41, ¶ 1; Def.'s Resp.

Statement 11, ¶ 1. Special Agent Coulter also interviewed Ms. Wang a second time, on

September 24, 2013. Pl.'s Statement 41, ¶ 3; Def.'s Resp. Statement 11, ¶ 3. *See generally* Def.'s

Statement Ex. 15 (reproducing the audio file from Special Agent Coulter's second interview with

Ms. Wang). During that interview, Ms. Wang stated that she had also contacted WMATA's

Office of Civil Rights. Pl.'s Statement 41, ¶ 4; Def.'s Resp. Statement 11, ¶ 4.

### 8. EEOC Charge (October 2, 2013)

Ms. Wang filed a Charge of Discrimination against WMATA with the United States

Equal Employment Opportunity Commission (EEOC) on October 2, 2013. Am. Compl. ¶ 24;

Answer Am. Compl. ¶ 24; Pl.'s Statement 41–42, ¶ 6; Def.'s Statement 11, "Page 41 of 63," ¶ 6. Her Charge alleged that WMATA subjected her to ongoing discrimination because of her race and gender, and that WMATA was retaliating against her because she opposed the discrimination. Pl.'s Statement 41–42, ¶ 6; Def.'s Statement 11, "Page 41 of 63," ¶ 6.

### 9. Termination (October 10, 2013)

On October 10, 2013, WMATA terminated Ms. Wang's employment as WMATA's Financial Control Manager. Def.'s Statement ¶¶ 1, 72; Pl.'s Statement 1, ¶ 1; *id.* at 3, ¶ 23. Ms. Wang's termination letter cited Ms. Wang's unsatisfactory performance on her corrective action plan:

> The results of the [corrective action plan] in summary are as follows: Two of ten deliverables (Items number 1 and 6) met the expected deadline. One ongoing goal (Item number 2) has not been met. Moreover, all but items 1 and 6 required repeated instruction and direction on how to complete. Additionally, when deliverables were re-submitted for rating, the work products did not meet the requirements.

Def.'s Statement Ex. 1, ECF No. 19-3. At the time of Ms. Wang's termination, problems with the IFO Project persisted. Am. Compl. ¶ 120; Answer Am. Compl. ¶ 120; *see also supra* Parts II.B.2, II.C.3 (recounting the problems WMATA experienced with the IFO Project). WMATA received a copy of Ms. Wang's EEOC Charge after Ms. Wang was terminated. Def.'s Statement ¶ 61; Pl.'s Statement 3, ¶ 21.

### E. Procedural History

After exhausting administrative remedies, Ms. Wang filed suit against WMATA in this Court. *See* Am. Compl. ¶¶ 24–27; Answer Am. Compl. ¶¶ 24–27. Ms. Wang claims that WMATA violated Title VII of the Civil Rights Act of 1964[5] by discriminating against her on the

---

[5] Pub. L. No. 88-352, Title VII, 78 Stat. 241, 253–66 (codified as amended at 42 U.S.C. §§ 2000e–2000e-17).

basis of her national origin, race, and sex. *See* Am. Compl. ¶¶ 195–210. She further claims that

WMATA violated Title VII by retaliating against her in response to her opposition to that

discrimination. *See id.* ¶¶ 211–220. Lastly, Ms. Wang claims that WMATA retaliated against her

in violation of the whistleblower provision of the American Recovery and Reinvestment Act of

2009 (ARRA).[6] *See* Am. Compl. ¶¶ 221–230.

WMATA now moves for summary judgment on all of Ms. Wang's claims. *See* Def.'s

Mot. Summ. J., ECF No. 19. For Ms. Wang's Title VII discrimination and retaliation claims,

WMATA argues that, among other reasons for summary judgment, WMATA had legitimate

non-discriminatory reasons for terminating Ms. Wang's employment: namely, a "history of

performance complaints," which included Ms. Wang's failure, in WMATA's view, to meet the

expectations of her position as expressed in her final corrective action plan. *See* Def.'s Mem. P.

& A. Supp. Def.'s Mot. Summ. J. 8–30, ECF No. 19-1 [hereinafter Def.'s Mem.]. For

Ms. Wang's ARRA retaliation claim, WMATA argues that (1) Ms. Wang cannot establish that

any whistleblowing disclosures she made were related to funds specified in the ARRA,

(2) Ms. Wang did not make disclosures that the ARRA's whistleblower provision protects, and

(3) Ms. Wang cannot show that any protected disclosures caused her termination. *See id.* at

30–38. Before discussing the merits of WMATA's summary judgment motion, the Court reviews

the applicable legal standard.

### III.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary

judgment if "the movant shows that there is no genuine dispute as to any material fact and the

---

[6] Pub. L. No. 111-5, § 1553, 123 Stat. 115, 297–302.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is essentially "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

The principal purpose of summary judgment is to determine whether there is a genuine need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. The non-movant may not rest upon mere allegations or denials but must instead present affirmative evidence. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (citing *Anderson*, 477 U.S. at 257).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

# IV. ANALYSIS

The Court addresses Ms. Wang's Title VII claims before turning to her ARRA retaliation claim.

## A. Title VII Claims

### 1. Governing Principles

Under Title VII, employers may not "refuse to hire," "discharge," or "otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of the individual's "race . . . , sex, or national origin." 42 U.S.C. § 2000e-2(a). Title VII also contains an antiretaliation provision, which "forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has 'made a charge . . . or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).

In this circuit, two key cases outline the litigation framework for Title VII discrimination and retaliation cases: *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); and *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008). The three-part *McDonnell Douglas* burden-shifting framework applies when a Title VII plaintiff offers only indirect evidence of discrimination or retaliation at summary judgment. *See Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (applying the framework to a discrimination claim); *Morgan v. Fed. Home Mortg. Corp.*, 328 F.3d 647, 650–51 (D.C. Cir. 2003) (applying the framework to a retaliation claim, in addition to a discrimination claim). Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if she does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it

does, then the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination. 411 U.S. at 802–05. Although *McDonnell Douglas* shifts the burden of production between the parties, the plaintiff retains the burden of persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

In the D.C. Circuit, *Brady* streamlines the *McDonnell Douglas* framework when, in considering a motion for summary judgment, the Court immediately observes that a plaintiff suffered an "adverse employment action" and that her employer asserted a "legitimate, non-discriminatory reason" for the alleged discrimination or retaliation. *See* 520 F.3d at 494; *see also Jones v. Bernanke*, 557 F.3d 670, 678–79 (D.C. Cir. 2009) (explaining that *Brady*'s "principles apply equally to retaliation claims"). That is the case here: Ms. Wang suffered an adverse employment action when WMATA terminated her employment. *See Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (listing possible adverse employment actions, and including "firing" as one of them (quoting *Taylor*, 350 F.3d at 1293)). By arguing that Ms. Wang's termination flowed from Ms. Wang's history of inadequate work performance, WMATA has asserted a legitimate, non-discriminatory reason for Ms. Wang's termination. *See* Def.'s Mem. 23–30 (arguing that Ms. Wang had "a history of performance complaints at WMATA").

In this case, therefore, *Brady* directs the Court to forgo *McDonnell Douglas* and instead to resolve one central question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory or [non-retaliatory] reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . , sex, or national origin [or retaliated against her because of her protected Title VII activity]?" *Brady*, 520 F.3d at 494; *see also McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C.

Cir. 2012) (adopting *Brady*'s formulation in a retaliation case). Phrased in terms of the facts of this case, the Court must consider whether Ms. Wang has produced sufficient evidence for a reasonable jury to find (1) that Ms. Wang's work performance was "not the actual reason" for her termination and (2) that WMATA intentionally discriminated against Ms. Wang on the basis of her race, sex, or national origin, or retaliated against her because she opposed a practice made unlawful under Title VII. To answer these questions, the Court must examine the totality of the evidence and ask "whether the jury could infer discrimination [or retaliation] from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination [or retaliation] that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc)); *see also Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (adopting this formulation for both discrimination and retaliation claims).

## 2. Discrimination Claims

WMATA argues that it should receive summary judgment on Ms. Wang's discrimination claims for three principal reasons: (1) many of WMATA's allegedly discriminatory acts are not adverse employment actions on which a Title VII plaintiff can base her discrimination claims, (2) Ms. Wang lacks the similarly situated comparators that WMATA contends are necessary to establish Ms. Wang's discrimination claims, and (3) WMATA had legitimate, non-discriminatory reasons for terminating Ms. Wang. *See* Def.'s Mem. 8–17, 23–30. Ms. Wang responds by arguing that she can establish a prima facie case of discrimination and that WMATA's stated reasons for her termination are a pretext for discrimination. *See* Pl.'s Mem. P.

& A. Opp'n Def.'s Mot. Summ. J. 26–32, ECF No. 20 [hereinafter Pl.'s Opp'n]. Before

addressing the arguments about WMATA's legitimate, non-discriminatory reasons for

Ms. Wang's termination and whether those reasons were pretextual, the Court first addresses the

arguments relating to a prima facie case of discrimination.

<em>a. Prima Facie Case: Adverse Employment Action</em>

As discussed earlier, under *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490 (D.C.

Cir. 2008), the Court need not examine whether Ms. Wang has made out a prima facie case of

discrimination, because Ms. Wang suffered an adverse employment action (she was terminated)

and WMATA has asserted a legitimate, non-discriminatory reason for her termination

(Ms. Wang's history of inadequate work performance). *See supra* Part IV.A.1; *see also Jones v.*

*Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (explaining that, in these circumstances, the Court

"need not—*and should not*—decide whether the plaintiff actually made out a prima facie case"

(quoting *Brady*, 520 F.3d at 494)). Of course, in a case in which an employer's action does not

clearly qualify as an adverse employment action, "the Court still first must determine whether

plaintiff suffered an adverse employment action." *Donovan v. Powell*, No. 107913, 2016 WL

107913, at *4 (D.D.C. Jan. 8, 2016) (internal quotation mark omitted) (quoting *Adesalu v.*

*Copps*, 606 F. Supp. 2d 97, 103 (D.D.C. 2009)); *see also Brady*, 520 F.3d at 494 (indicating that,

even though a plaintiff need not establish a prima facie case to defend against a motion for

summary judgment, she still must show that she "has suffered an adverse employment action").

WMATA does not dispute that terminating Ms. Wang was an adverse employment

action. *See* Def.'s Mem. 9 n.2 ("WMATA concedes that termination is an adverse employment

action."). And Ms. Wang does not, in her summary judgment briefing, offer other WMATA

actions as adverse employment actions on which she bases her discrimination claims. *See* Pl.'s

Opp'n 27 (indicating that Ms. Wang established an adverse employment action because

"WMATA undoubtedly terminated her"). By declining to respond to WMATA's argument about other potential adverse employment actions in this case, Ms. Wang has conceded the issue to WMATA. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); Pl.'s Opp'n 26–32 (declining to address WMATA's argument). The parties therefore appear to agree that Ms. Wang's firing is the only adverse employment action on which she bases her Title VII discrimination claims. Therefore, the Court proceeds under the assumption that (1) any verbal statements Mr. Greaves made to Ms. Wang, (2) Ms. Wang's written warnings, and (3) Ms. Wang's corrective action plan are not on their own adverse employment actions on which Ms. Wang bases her discrimination claims. *See generally Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (explaining that, to be an adverse employment action, an employer's action must effect significant and objectively tangible harm); Pl.'s Statement 3, ¶¶ 13, 17 (conceding that Ms. Wang "sustained no change in benefits, salary, or title" from receiving written warnings); *id.* at 25–30 (omitting any allegation that Ms. Wang suffered significant or tangible harm from Mr. Greaves verbal statements); *id.* at 35–40 (same, for Ms. Wang's receipt of her corrective action plan).

But even though those three categories of WMATA actions are not adverse employment actions on their own, WMATA incorrectly contends that they "therefore must be disregarded from consideration of [Ms. Wang's] discrimination claims." Def.'s Mem. 13. Instead, "[w]hen determining whether summary judgment . . . is warranted for the employer, the court considers *all* relevant evidence presented" by the parties. *Brady*, 520 F.3d at 495 (emphasis added). "All" relevant evidence means

> any combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006) (quoting *Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006)). "[T]he court reviews each of the three relevant categories of evidence—prima facie, pretext, and any other—to determine whether they 'either separately or in combination' provide sufficient evidence for a reasonable jury to infer [discrimination or] retaliation." *Jones*, 557 F.3d at 679 (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002)).

Here, Mr. Greaves's statements, Ms. Wang's written warnings, and Ms. Wang's corrective action plan are at least "independent evidence of discriminatory statements or attitudes on the part of the employer." *Mastro*, 447 F.3d at 855 (quoting *Holcomb*, 433 F.3d at 896). And, in fact, one could argue that they were building blocks that culminated in the termination. Accordingly, the Court will not disregard these actions, but instead will consider them as part of the evidence that the Court must review to determine whether a reasonable jury could infer discrimination against Ms. Wang on the basis of her race, sex, or national origin. *See infra* Part IV.A.2.c (undertaking this inquiry).

### b. Prima Facie Case: Comparators

Before resolving the "central question" required by *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), the Court addresses WMATA's argument that Ms. Wang cannot show that "other similarly situated employees [that were] not members of her protected class[] did not suffer similar adverse actions." Def.'s Mem. 13 (brackets omitted) (quoting *Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001)). WMATA contends that,

"[b]ecause [Ms. Wang] has no comparators, this Court should enter summary judgment" for WMATA on Ms. Wang's discrimination claims. *Id.* at 17.

To be sure, to make out a prima facie case of discrimination, the plaintiff may "demonstrate (1) that she is a member of a protected class; (2) that she was similarly situated to an employee who was not a member of the protected class; and (3) that she and the similarly situated person were treated disparately." *Holbrook v. Reno*, 196. F.3d 255, 261 (D.C. Cir. 1999). "But this is not the only way" in which a plaintiff can make out a prima facie case of discrimination. *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). Furthermore, as mentioned before, when the plaintiff has suffered an adverse employment action and the employer has advanced a legitimate, non-discriminatory reason for that action, then "the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappears' and 'drops out of the picture.'" *Brady*, 420 F.3d at 493–94 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510, 511 (1993)). Because that is the case here, *see supra* Part IV.A.1, Ms. Wang need not produce similarly situated comparators for two reasons: (1) she can create an inference of discrimination to make out a prima facie case by other means; and (2) given WMATA's stated legitimate, non-discriminatory reasons for terminating Ms. Wang, the Court need not decide whether Ms. Wang actually made out a prima facie case of discrimination. *See Brady*, 420 F.3d at 494 (explaining that, in these circumstances, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case"). For these reasons, WMATA's comparator-based argument is incorrect under the law, and the Court will not consider it further.

*c. Whether a Reasonable Jury Could Infer Discrimination:*
*WMATA's Non-Discriminatory Reasons for Termination and Ms. Wang's Evidence*
*that those Reasons Were a Pretextual Cover for Discrimination*

The Court turns, at last, to the "central question" it must resolve in considering WMATA's motion for summary judgment on Ms. Wang's discrimination claims: whether Ms. Wang has produced sufficient evidence for a reasonable jury to find (1) that Ms. Wang's work performance was "not the actual reason" for her termination and (2) that WMATA intentionally discriminated against Ms. Wang on the basis of her race, sex, or national origin. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Ms. Wang can meet her burden of production in multiple ways. *Id.* at 495. She can "suggest[] that the employer treated other employees of a different race . . . , sex, or national origin more favorably," or "attempt to demonstrate that [WMATA] is making up or lying about the underlying facts that formed the predicate for the employment decision." *Id.*[7] Ms. Wang can also point to "changes and inconsistencies in the stated reasons for the adverse action; the employer's failure to follow established procedures or criteria; the employer's general treatment of minority employees; or discriminatory statements by the decisionmaker." *Id.* at 495 n.3. She "might also establish pretext with evidence that a factual determination underlying an adverse employment action is egregiously wrong," or with evidence that "[a]n employer's investigation . . . is so unsystematic

---

[7] A jury cannot conclude that the employer is lying about the underlying facts, however, when "the employer's stated belief about the underlying facts is reasonable in light of the evidence." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). Likewise, an employer can prevail on its motion for summary judgment if it can "demonstrate the absence of a genuine dispute in the record over whether [the employer] honestly and reasonably believed in" the legitimate, non-discriminatory reasons it offered for a plaintiff's termination. *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005). Because of the circumstances surrounding Ms. Wang's corrective action plan, including Mr. Greaves's statements to Ms. Wang, as discussed below, the Court finds that neither of these situations applies here.

and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015) (first citing *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996); then citing *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006)).

In Ms. Wang's summary judgment brief, she contends that a "mosaic of circumstantial evidence, . . . viewed in the light most favorable to [Ms.] Wang, permits a jury to reject WMATA's proffered reasons for firing [Ms.] Wang and [to] infer discrimination based on race, national origin, and gender." Pl.'s Opp'n 32. Ms. Wang's evidence includes

(1) Ms. Wang's contention that Mr. Greaves "had no substantive basis for putting her on a [corrective action plan]";

(2) Ms. Wang's assertion that the corrective action plan "had unattainable, unreasonable, unmeasurable, and inappropriate goals," including goals with "due dates only hours after [Mr.] Greaves issued the [corrective action plan]";

(3) WMATA's alleged "failure . . . to adhere to its own policies" for its Human Resources department's involvement "in drafting, reviewing, and insuring the appropriateness and fairness of a [corrective action plan]";

(4) Mr. Greaves's "denial that he screamed 'You're fired' at [Ms.] Wang on September 6, 2013," even though another WMATA employee stated that he overheard Mr. Greaves's outburst;

(5) Mr. Greaves's "refusal to admit that he had innocuous conversations with [Ms.] Wang about Chinese cooking and her visits to family in China";

(6) Mr. Greaves's references to Ms. Wang's communication skills and to "the challenges she faced as a 'foreigner' who was not a native English speaker"; and

(7) Statements that Mr. Greaves made when he tried to "bully" Ms. Wang "in an aggressive and threatening manner [that] he would not have used in dealing with a male colleague."

*Id.* at 31–32. The Court first turns to the evidence about Ms. Wang's corrective action plan (items (1), (2), and (3) above) before discussing evidence about Mr. Greaves's statements (items (4), (5), (6), and (7) above).

When an employee fails to improve her work performance and does not successfully complete a corrective action plan, her employer can justifiably terminate her based on that unsuccessful performance. *See, e.g.*, *Brown v. Vance–Cooks*, 920 F. Supp. 2d 61, 67–68 (D.D.C. 2013) (noting that the plaintiff failed to dispute his lack of improvement during his performance improvement plan period, and concluding that his omission meant that he could not "demonstrate [the] falsity of the criticisms of his performance"). In a typical case with these facts, the employer's reasons are not a pretextual cover for discrimination. *See, e.g.*, *id.* at 68 (finding that the plaintiff had "simply not proven that [the employer's] reasons were pretext").

Here, however, Ms. Wang implies that the corrective action plan itself flowed from Mr. Greaves's allegedly discriminatory animus. *See* Am. Compl. ¶ 206 (alleging discrimination because Mr. Greaves "harshly . . . disciplined" Ms. Wang); Pl.'s Opp'n 31–32 (contending that the correction action plan was unwarranted and that its terms were unreasonable); Wang Dep. 64:12–65:1, Pl.'s Statement Ex. 21, ECF No. 20-23 ("[T]he first warning, the second warning, the corrective action plan[—]I think they're all based on discrimination."). Because the plan itself could have been discriminatory, the Court follows the D.C. Circuit's directive and will not consider it as evidence that Ms. Wang was performing below WMATA's legitimate expectations:

> The conduct alleged by a Title VII plaintiff to be tainted by the employer's discrimination cannot serve as evidence that the employee was performing below the employer's legitimate expectations. Otherwise, any employer could routinely evade Title VII's protections by accusing an employee of misconduct, firing [her], and claiming that the employee failed to demonstrate a prima facie case of

discriminatory termination because [her] alleged misconduct constituted performance below legitimate expectations.

*Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 853–54 (D.C. Cir. 2006); *see also id.* at 856 (explaining that employers cannot claim "that the mere fact that they conducted an investigation and fired [the employee] as a result should insulate their actions from further scrutiny," when "sufficient evidence exists for a jury to conclude . . . that discriminatory treatment may have permeated the investigation itself").

Accordingly, in reviewing the corrective action plan, its terms, and how WMATA monitored Ms. Wang's performance on the corrective action plan, the Court analyzes whether that evidence calls into question the plan's fairness and impartiality. *See generally id.* at 855–57 (assessing whether an employer's pre-termination investigation into an employee's conduct appeared fair and impartial). If a reasonable jury could find that the WMATA personnel monitoring the corrective action plan appear not to be credible, or that the overall plan appears to lack fairness or impartiality, the Court may not credit WMATA's view of the plan over Ms. Wang's. *See id.* at 857 ("Although a jury may ultimately decide to credit the version of the events described by the employer over that offered by the employee, this is not a basis upon which a court may rest in granting a motion for summary judgment." (brackets and internal quotation marks omitted) (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005))). Along these lines, the Court cannot grant summary judgment if a reasonable jury could conclude that WMATA's assessment of Ms. Wang's conduct was "an inquiry colored by . . . discrimination." *See id.* (reversing the district's order of summary judgment after finding that a jury could conclude that the employer's investigation was unfair, partial, and discriminatory).

On the evidence presented in this case, the Court determines that a reasonable jury could conclude that Ms. Wang's corrective action plan was unfair, partial, and created solely to

accelerate her termination. The evidence reveals several circumstances in connection with the plan that were potentially unfair to Ms. Wang.

First, Mr. Greaves contemplated terminating Ms. Wang's employment as early as September 5, 2013, even though he did not issue Ms. Wang her corrective action plan until September 11, 2013.[8] In an email on September 5, Mr. Greaves not only recommended dismissal "if there is another incident," but he also expressed his lack of faith in any corrective action plan: "I don't think placing the employee on a [corrective action plan] is the solution." Def.'s Statement Ex. 12/13, at 487.[9] These September 5 statements would support a reasonable jury's conclusion that Ms. Wang's later corrective action plan was simply a ploy by which Mr. Greaves could create a reason to terminate her—*i.e.*, that he was setting her up to fail.[10]

Second, Ms. Wang received her corrective action plan on September 11, 2013, but the plan made four of the plan's ten performance goals due on that same day. *See* Def.'s Statement

---

[8] *Compare* Def.'s Statement Ex. 12/13, at 487–88, ECF No. 19-14 (reproducing emails Mr. Greaves sent on September 5, 2013, in which he wrote that his "recommendation is dismissal if there is another incident" and that "I recommend termination should [Ms. Wang's] actions continue"); Def.'s Statement ¶ 36 ("On September 5, 2013, Mr. Greaves proposed Ms. Wang's termination if another incident occurred."), *with id.* ¶ 64 (stating that Mr. Greaves issued Ms. Wang her corrective action plan on September 11, 2013); Pl.'s Statement ¶ 22 (same).

[9] To be sure, Mr. Greaves's email also discusses what he perceives to be Ms. Wang's unsatisfactory work performance. *See* Def.'s Statement Ex. 12/13, at 487. But because other evidence about Ms. Wang's performance rebuts Mr. Greaves's opinion, his other September 5 statements can nonetheless allow a jury to question the fairness of Ms. Wang's corrective action plan. *See George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005) (explaining that, even if the record contains evidence supporting an employer's allegations about an employee's substandard performance, the employer's views can still be pretextual if evidence exists to rebut the employer's evidence); *see, e.g.*, Julia Dep. 20:21–23:18, Pl.'s Statement Ex. 6, ECF No. 20-8 (rebutting Mr. Greaves's views of Ms. Wang's performance); Vu Dep. 14:12–17:22, Pl.'s Statement Ex. 4, ECF No. 20-6 (same).

[10] Ms. Wang takes that view of the corrective action plan. *See* Def.'s Statement Ex. 15, at 19:16–20:00 (reproducing the audio file from Ms. Wang's September 24, 2013 interview with WMATA's OIG, in which Ms. Wang states that Mr. Greaves issued the corrective action plan so that Ms. Wang was "ready to be fired"); *see also id.* ¶ 58 (discussing the audio files).

Ex. 20, at 1, 5–11, ECF No. 19-20 (reproducing Ms. Wang's corrective action plan, and showing that the first four performance goals were due on September 11, 2013). Although evidence shows that WMATA later specified that one of those four goals had an "ongoing" due date,[11] and even though two of those four goals had been requested or partially completed before September 11,[12] a reasonable jury could still question the impartiality of a corrective action plan that set four due dates on the same day that Ms. Wang received the plan. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006) (explaining that, when procedural flaws accompany an employer's pre-termination procedures, the fairness and impartiality of those procedures are "genuine issues of material fact properly assigned to the jury"). And evidence showing that Ms. Wang received the plan at a 4:30 PM meeting on September 11 might make the plan seem even more unfair to the jury, because Ms. Wang would have had only the rest of that afternoon to complete four of the ten performance goals on her corrective action plan.[13] The plan's due dates support the view that the plan, being unfair, was merely a pretext for discrimination.

Third, Ms. Wang's corrective action plan shows that Mr. Greaves evaluated her performance based, at least in part, on subjective criteria. "Although 'employers may of course

---

[11] *Compare* Pl.'s Statement Ex. 24, at 3, ECF No. 20-26 (reproducing an initial version of the corrective action plan, in which the second deliverable was due on September 11), *and id.* at 40, ¶ 18 (indicating that Exhibit 24 reproduces the initial version of the plan), *with* Def.'s Statement Ex. 20, at 6 (noting that, in a version of the plan that Ms. Audette and Mr. Greaves signed on October 10, 2013, the due date for the second deliverable was "ongoing").

[12] *See* Def.'s Statement Ex. 20, at 7 (indicating that the third deliverable was "requested in June 2013" and that the fourth deliverable "was already in progress at the start of the [corrective action plan]").

[13] *See* Wang Dep. 238:12–242:1, Pl.'s Statement Ex. 1, ECF No. 20-3 (describing how Ms. Wang received her corrective action plan at a 4:30 PM meeting with Mr. Greaves and WMATA Employee Relations Officer Belinda Press); Pl.'s Statement Ex. 22, ECF No. 20-24 (reproducing emails between Ms. Press and Ms. Wang that discussed the 4:30 PM meeting on September 11, 2015).

take subjective considerations into account in their employment decisions,' . . . heavy reliance on subjective criteria may be used to 'mask' or 'camouflage' discrimination." *Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (en banc)). The Court accordingly treats the subjective explanations for Ms. Wang's performance on her corrective action plan "with caution." *Id.* Viewing Mr. Greaves's comments on Ms. Wang's performance from this perspective, the Court notes that Ms. Wang's performance on one deliverable rested entirely on subjective considerations, and that Mr. Greaves's criticisms about Ms. Wang's performance often rested on subjective considerations.[14] Because of subjective considerations' significant role in Mr. Greaves's evaluation of Ms. Wang's performance, a reasonable jury could suspect that discriminatory animus biased Mr. Greaves's evaluation—or, at least, that a desire to terminate Ms. Wang made Mr. Greaves's evaluation "inexplicably unfair." *Mastro*, 447 F.3d at 855; *see* Def.'s Statement Ex. 12/13, at 487–88 (showing that Mr. Greaves contemplated terminating Ms. Wang as early as September 5, 2013).

Fourth, evidence in the record supports Ms. Wang's contention that some of her corrective action plan's performance goals were not within her normal work responsibilities. *See* Pl.'s Opp'n 20 ("[Ms.] Wang . . . had not previously completed certain tasks outlined in the

---

[14] *See* Def.'s Reply Pl.'s Opp'n Def.'s Mot. Summ. J. 16–17, ECF No. 21 [hereinafter Def.'s Reply] (explaining that the final corrective action plan, as reproduced in WMATA's Exhibit 20, contains Mr. Greaves's notes and "deliberative process for all aspects of the [corrective action plan]"); Def.'s Statement Ex. 20, at 6 (reproducing Ms. Wang's second corrective action plan performance goal, which required Ms. Wang to "[a]lways communicate with WMATA employees and business partners in a professional, respectful, and effective manner"); *id.* at 6–11 (criticizing Ms. Wang for using "incoherent" language; failing "to exhibit a higher order of understanding, thinking, and expression"; failing "to display deductive reasoning with precision and accuracy"; submitting a message that "lacked flow"; failing to "understand . . . consequences"; and failing "to take initiative and seek the support she needs").

[corrective action plan] because they were not assigned to her."). An email from Lori Lloyd-Smith, another WMATA employee, indicates that updating the quarterly closing checklist (the fourth goal on Ms. Wang's corrective action plan) was previously Ms. Lloyd-Smith's responsibility.[15] And even though Ms. Wang's seventh goal instructed her to "ensur[e] all balance sheet accounts and related revenue and expense accounts [were] reconciled" for WMATA's quarterly financial statements, WMATA's quarterly financial statement closing schedule shows that, for WMATA accounts not assigned to the General Ledger branch, other WMATA employees were responsible for performing those tasks .[16] An email from Mr. Greaves supports Ms. Wang's contention that Ms. Lloyd-Smith, not Ms. Wang, was previously responsible for preparing "P[rovided] B[y] C[lient] lists" for audits (the eighth goal on Ms. Wang's corrective action plan).[17] Finally, Ms. Wang's last goal lists duties relating to federal forms, but emails show that another WMATA employee had previously performed some of those

---

[15] *Compare* Def.'s Statement Ex. 20, at 7 (requiring Ms. Wang to "[e]nsure . . . the quarterly closing checklist [was] updated"), *with* Pl.'s Statement Ex. 25, ECF No. 20-27 (reproducing an email in which Ms. Lloyd-Smith sent Ms. Wang the "Q3 checklist" in response to Mr. Greaves's directives).

[16] *Compare* Def.'s Statement Ex. 20, at 9 (requiring Ms. Wang to "ensur[e] all balance sheet accounts and related revenue and expense accounts [were] reconciled" for WMATA's quarterly financial statements), *with* Pl.'s Statement Ex. 26, at 267–68, ECF No. 20-28 (reproducing a document titled "WMATA Quarterly Financial Statement Closing Schedule," which shows that many individuals besides Ms. Wang were also responsible for reconciling accounts for the quarterly financial statements).

[17] *See* Pl.'s Statement 49, ¶ 3 ("WMATA had assigned Lori Smith to this task."). *Compare* Def.'s Statement Ex. 20, at 10 (requiring Ms. Wang to "ensur[e] the General Ledger requirements for the PBC lists for the Basic Financial Statements audit, Single audit, and N[ational] T[ransit] D[atabase] audit are completed"), *with* Pl.'s Statement Ex. 27, ECF No. 20-29 (reproducing an email from Mr. Greaves to Ms. Lloyd-Smith and Ms. Wang, in which Mr. Greaves declares that "[Ms. Wang] will be responsible for ensuring all PBC items for the general ledger area for the Basic Financial Statements audit, Single audit, and NTD audit are completed," and instructs Ms. Wang to "follow up with [Ms. Lloyd-Smith] . . . to [see] what needs to be done").

duties.[18] Although these performance goals do fall within the duties outlined in Ms. Wang's job description, *see* Def.'s Statement Ex. 2, ECF No. 19-4 (requiring the Financial Control Manager to monitor WMATA's compliance with National Transit Database requirements, to coordinate responses to audits, and to manage preparation of financial statements), Ms. Wang has explained that, when WMATA hired Ms. Wang, her supervisor told her that not all of the duties in the job description fell within Ms. Wang's responsibilities, *see* Wang Dep. 24:13–25:12, Pl.'s Statement Ex. 1, ECF No. 20–3. Regardless, even if Mr. Greaves could have reasonably expected Ms. Wang to perform all the corrective action plan's performance goals, a reasonable jury could still find the plan unfair because (1) Ms. Wang had to assume responsibilities that others had previously performed, and (2) she had to do so in a short period of time. *See, e.g.*, Def.'s Statement Ex. 20, at 1, 7, 9 (making Ms. Wang's fourth performance goal due on September 11, the first day of the corrective action plan period, and making her seventh performance goal due on September 16, less than a week after the plan period began).

From the evidence about all these circumstances surrounding Ms. Wang's corrective action plan, a reasonable jury could conclude that the plan was so "inexplicably unfair" that it was a pretext for discrimination. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855–57 (D.C. Cir. 2006).[19] Put another way, a reasonable jury could find that, by relying on Ms. Wang's

---

[18] *Compare* Def.'s Statement Ex. 20, at 11 (requiring Ms. Wang to "ensur[e] the [National Transit Database (NTD)] F10 form . . . is completed" and to "[r]econcile the Operating results . . . to the [Schedule of Expenditures of Federal Awards (SEFA)] & [Federal Financial Report (FFR)]"), *with* Pl.'s Statement Ex. 28, at 84, ECF No. 20-30 (reproducing an email in which WMATA employee Panela Reed discusses how she "reconcile[ed] the NTD Form F-10 to SEFA").

[19] Even if Ms. Wang's corrective action plan does not, standing alone, rise to the level of being "inexplicably unfair," *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006), the Court finds that the corrective action plan, combined with the statements Mr. Greaves made to Ms. Wang, provides sufficient evidence from which a reasonable jury could infer discrimination. The Court discusses statements Mr. Greaves made to Ms. Wang below. Viewing

corrective action plan as the basis for her termination, WMATA is "making up or lying about the underlying facts that formed the predicate" for Ms. Wang's termination. *See Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).[20]

_____

the evidence as a whole, the Court cannot grant WMATA summary judgment on Ms. Wang's discrimination claims.

[20] In defending the corrective action plan, WMATA asserts that "even if a court believes that the employer made a poor personnel decision, the court may not second-guess that decision 'absent demonstrably discriminatory motive.'" Def.'s Reply 18 (quoting *Ajisefinni v. KPMG LLP*, 17 F. Supp. 3d 28, 39 (D.D.C. 2014)).

The Court's discussion here, however, finds that a reasonable jury could consider Ms. Wang's corrective action plan, and the circumstances surrounding it, to be evidence of "demonstrably discriminatory motive." In doing so, the Court follows D.C. Circuit precedent and examines whether a reasonable jury could find that the corrective action plan was so "inexplicably unfair" that it was a pretext for discrimination. *Mastro*, 447 F.3d at 855–57. If the jury can infer pretext in this manner, the plan becomes evidence of the employer's "demonstrably discriminatory motive." *Cf. Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982) (concluding that, when the employee *failed* to prove that the employer's legitimate, non-discriminatory reason for its employment decision was pretextual, the court should not "second guess" that decision "absent demonstrably discriminatory motive"). In light of the evidence showing that Ms. Wang's corrective action plan may have been a ruse by which Mr. Greaves could terminate her, "second-guessing" WMATA's actions in this case does not contravene Title VII principles in this Circuit.

The Court's analysis of Ms. Wang's corrective action plan recognizes that whether Ms. Wang "may have met expectations in the past is irrelevant" to whether Mr. Greaves "believed that [Ms. Wang] was performing adequately when [Mr. Greaves] placed [Ms. Wang] on the [corrective action plan]." *Khan v. Holder*, 37 F. Supp. 3d 213, 227 (D.D.C. 2014). The Court accordingly does not consider Ms. Wang's argument that, because of Ms. Wang's previous satisfactory performance evaluations, Mr. Greaves "had no substantive basis for putting her on a [corrective action plan]." *See* Pl.'s Opp'n 31–32 (making that argument).

The Court also does not consider Ms. Wang's argument that WMATA failed "to adhere to its own policies regarding the involvement of [WMATA's human resources department] in drafting, reviewing, and [e]nsuring the appropriateness and fairness of a [corrective action plan]." *Id.* at 32. Ms. Wang has failed to develop this argument, and has therefore waived it, because she does not allege any particular procedures that the human resources department should have followed. *See id.* at 22 (alleging that Ms. Press, a WMATA employee relations officer, did not suggest changes to the corrective action plan, did not ask Mr. Greaves how he would monitor Ms. Wang's progress, did not monitor Ms. Wang's progress, and was just an observer of the process—but without mentioning any human resources policies WMATA violated); *id.* at 33 (recounting Ms. Wang's interactions with WMATA's Office of Civil Rights and with Ms. Press, again without mentioning any human resources policies); Pl.'s Statement 35–40 (same); *see also id.* at 31, ¶ 4 (stating that Special Agent Mark Coulter, a WMATA OIG

Although the above-referenced evidence of pretext is sufficient to submit Ms. Wang's

discrimination claims to a jury, *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)

("The factfinder's disbelief of the reasons put forward by the defendant . . . may, together with

the elements of the prima facie case, suffice to show intentional discrimination."), Ms. Wang

provides additional evidence. Apart from the corrective action plan, evidence relating to

Mr. Greaves's statements and attitudes also supports the idea that WMATA's legitimate,

non-discriminatory reasons for terminating Ms. Wang are a pretextual cover for discrimination.

To attack WMATA's legitimate, non-discriminatory reasons for her termination, Ms. Wang may

rely on "evidence of discriminatory statements or attitudes" that Mr. Greaves espoused. *See*

*Mastro*, 447 F.3d at 854–55; *accord Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir.

1998) (en banc). Stray comments lacking "*any* temporal or substantive relationship" to the

adverse employment action are not evidence of discriminatory intent. *Francis v. Perez*, 970 F.

Supp. 2d 48, 65 (D.D.C. 2013). But, when statements relate to the bias that the plaintiff alleges,

they substantively relate to the adverse employment action and can show discriminatory intent.

*See Talavera v. Shah*, 638 F.3d 303, 310 (D.C. Cir. 2011) (applying this principle, even in a

situation in which the manager other than the one responsible for the adverse employment action

made the statements); *cf. Harris v. Grp. Health Ass'n*, 662 F.2d 869, 873 (D.C. Cir. 1981)

(highlighting how the plaintiff neglected to allege "racial slights or slurs"). And even an

"isolated race-based remark" or "remarks made significantly before the relevant employment

action" can be "probative evidence of a supervisor's discriminatory attitude" when considered

---

employee, "explained that WMATA had specific procedures and protocols for terminations
which Greaves did not appear to have followed," but without mentioning what those procedures
were). *See generally Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013)
("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent
authority, are deemed waived.").

alongside additional evidence. *Morris v. McCarthy*, No. 14-5074, 2016 WL 3254902, at *7 (D.C. Cir. June 14, 2016).

As noted before, Ms. Wang suggests that Mr. Greaves made several statements that could show his discriminatory intent:

> (1) Mr. Greaves's "denial that he screamed 'You're fired' at [Ms.] Wang on September 6, 2013," even though another WMATA employee stated that he overheard Mr. Greaves's outburst;
>
> (2) Mr. Greaves's "refusal to admit that he had innocuous conversations with [Ms.] Wang about Chinese cooking and her visits to family in China";
>
> (3) Mr. Greaves's references to Ms. Wang's communication skills and to "the challenges she faced as a 'foreigner' who was not a native English speaker"; and
>
> (4) Statements that Mr. Greaves made when he tried to "bully" Ms. Wang "in an aggressive and threatening manner [that] he would not have used in dealing with a male colleague."

Pl.'s Opp'n 32.

The first two statements highlight instances in which Mr. Greaves's account of events differs from others'. For those statements, evidence supports Ms. Wang's assertions about Mr. Greaves's and others' differing opinions.[21] The first statement, Mr. Greaves's alleged outburst on September 6, 2013, is relevant to Ms. Wang's discrimination claims because Mr. Greaves allegedly made it close in time to Ms. Wang's termination. *See* Def.'s Statement Ex. 1, ECF No. 19-3 (showing that WMATA terminated Ms. Wang's employment about one

---

[21] *Compare* Greaves Dep. 147:16–149:14, Pl.'s Statement Ex. 3, ECF No. 20-5 (denying that Mr. Greaves told Ms. Wang that she was fired on September 6, 2013), *with* Wang Dep. 194:3–7, 206:2–6, 212:10–214:20, Pl.'s Statement Ex. 1, ECF No. 20-3 (recounting how Mr. Greaves told Ms. Wang that she was fired on September 6, 2013), *and* Vu Dep. 22:8–24:1, Pl.'s Statement Ex. 4, ECF No. 20-6 (recalling that, at some point, Mr. Greaves told Ms. Wang that she was fired). *Compare also* Greaves Dep. 31:18–32:16 (denying any conversations with Ms. Wang about her ethnic background), *with* Wang Dep. 186:2–190:20 (recalling conversations with Mr. Greaves about Ms. Wang's Chinese heritage).

month later, on October 10, 2013); *cf. Francis*, 970 F. Supp. 2d at 65 (disregarding an employer's comments because, among other things, they lacked a "temporal or substantive" relationship to the adverse employment action). And, because the second statement addresses Mr. Greaves's dubious attempt to deny making any statements in which he acknowledged Ms. Wang's ethnic heritage, it is substantively related to Ms. Wang's race and national origin discrimination claims. *See Talavera*, 638 F.3d at 309–10; *cf. Francis*, 970 F. Supp. 2d at 65. Ms. Wang can thus use both statements as evidence "that the employer is making up or lying about the underlying facts" or as evidence of "inconsistencies in the stated reasons for the adverse action." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 & n.3 (D.C. Cir. 2008). And both statements may cast doubt on the credibility of other statements that Mr. Greaves made about his motivations.

Ms. Wang's last two sets of statements highlight instances that could suggest that Mr. Greaves might possess discriminatory attitudes toward foreigners and toward women. As with the first two statements, evidence—including evidence aside from Ms. Wang's own opinions—supports Ms. Wang's assertions about the last two sets of statements.[22] The first of these statements provides some evidence that Mr. Greaves, in some respects, tied his view of Ms. Wang's work performance to her national origin. And the second of these statements indicates that Mr. Greaves adopted a hostile and aggressive manner with her, but there is no

---

[22] *See* Def.'s Statement Ex. 9, at 280, ECF No. 19-11 (reproducing Ms. Wang's 2012 performance evaluation, in which Mr. Greaves states that Ms. Wang "needs to make an avid effort to enhance her communication skills"); Wang Dep. 176:13–179:6 (recalling how Mr. Greaves told Ms. Wang that, "[a]s a foreign[er]," Ms. Wang especially needed to work on her communication); *id.* at 212:10–215:15, 267:6–15 (recalling how Mr. Greaves "yell[ed] and scream[ed] in [the] office" and how Ms. Wang "thought that day maybe [Mr. Greaves] would beat [her]"); Vu Dep. 22:8–24:1 (recalling a conversation between Mr. Greaves and Ms. Wang, and attributing "shouting and voice raising" to Mr. Greaves).

evidence that he did so with any of the men in the office. Because the statements address Mr. Greaves's possible bias based on national origin and sex, they relate substantively to Ms. Wang's national origin and sex discrimination claims. *See Talavera*, 638 F.3d at 309–10; *cf. Francis*, 970 F. Supp. 2d at 65. As "evidence of discriminatory statements or attitudes on the part of the employer," Ms. Wang can rely on them to show Mr. Greaves's discriminatory intent and the jury may decide the weight they deserve. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006) (quoting *Holcomb v. Powell*, 433 F.3d 889, 896 (D.C. Cir. 2006)); *see Talavera*, 638 F.3d at 309–10.[23]

The four sets of statements highlighting Mr. Greaves's positions and attitudes, combined with evidence relating to Ms. Wang's corrective action plan, show that WMATA's pre-termination procedures for Ms. Wang may have been "inexplicably unfair," *Mastro*, 447 F.3d at 855, and that Mr. Greaves may have harbored discriminatory attitudes, *see id.* (explaining that "evidence of discriminatory . . . attitudes" can be evidence on which a jury can infer discrimination). Based on such evidence together, a reasonable jury could conclude that Mr. Greaves intentionally discriminated against Ms. Wang on the basis of her race, sex, or national origin when he terminated her employment. The Court therefore cannot grant WMATA summary judgment on Ms. Wang's discrimination claims. *See Brady*, 520 F.2d at 494.

---

[23] Even though WMATA notes that "Mr. Greaves too is a foreigner," Def.'s Reply 8, the Supreme Court has cautioned that, "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group," *Castaneda v. Partida*, 430 U.S. 482, 499 (1977). In considering Ms. Wang's evidence, therefore, the Court does not consider Mr. Greaves's own status as a foreigner.

### 3. Retaliation Claim

The Court turns next to Ms. Wang's Title VII retaliation claim. "To prove unlawful retaliation, a plaintiff must show: (1) that [she] opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against [her]; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012); *see also id.* at 1380 n.3 (explaining that, "[a]lthough these [elements] are often described as the elements that a plaintiff must show to establish a 'prima facie' case of retaliation," they are also the elements that a plaintiff must ultimately prove in order to win [her] case" (citation omitted)).

In support of summary judgment in its favor on Ms. Wang's Title VII retaliation claim, WMATA repeats some arguments it made about Ms. Wang's discrimination claims and also makes some retaliation-specific arguments. WMATA argues that

(1) Many of WMATA's allegedly retaliatory acts are not materially adverse actions on which a Title VII plaintiff can base her retaliation claim;

(2) Before WMATA terminated Ms. Wang, WMATA lacked awareness of any activity Ms. Wang took that Title VII protected;

(3) Ms. Wang cannot prove any of her protected activity caused her termination; and

(4) WMATA had legitimate non-discriminatory reasons for terminating Ms. Wang.

*See* Def.'s Mem. at 17–30. In response, Ms. Wang asserts

(1) That she can establish a prima facie case of retaliation under Title VII; and

(2) That a jury could infer retaliation based on direct evidence of Mr. Greaves's retaliatory animus, circumstantial evidence showing that WMATA's non-discriminatory reasons for Ms. Wang's termination are pretextual, and how close in time the events in this case were.

*See* Pl.'s Opp'n 32–37. The Court addresses each of the parties' arguments in the context of the three elements Ms. Wang must prove.

*a. Opposition to a Practice Made Unlawful Under Title VII*

Under Title VII, a plaintiff can establish the first element of a retaliation case in two ways: (1) by opposing any practice that Title VII makes an unlawful employment practice, or (2) by making a charge, testifying, assisting, or participating in any manner in a Title VII investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a); *accord Borgo v. Goldin*, 204 F.3d 251, 255 & n.4 (D.C. Cir. 2000) (recognizing the two ways in which a plaintiff may allege retaliation). The "opposition clause" protects a broad range of informal actions or statements that employees make in resistance to actions they reasonably perceive to be discriminatory. *See Crawford v. Metro. Gov't*, 555 U.S. 271, 276–78 (2009) (explaining that "opposition" includes "tak[ing] no action at all to advance a position beyond disclosing it"); *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 24 (D.C. Cir. 2013) (explaining that, if "the employee-plaintiff . . . [has] a good faith and reasonable belief that the [employer's] practices are unlawful," her "opposition activity may be protected even though the employer's practices do not amount to a violation of Title VII"); *Truelove v. Trs. of the Univ. of the D.C.*, 744 F. Supp. 307, 313 (D.D.C. 1990) ("Title VII[] protects from retaliation a far broader scope of activities than the simple filing of an EEOC charge."). The "participation clause," on the other hand, protects an employee's actions in relation to "official" or "legal" Title VII proceedings. *See Borgo*, 204 F.3d at 255 n.4 (indicating that "official E[qual] E[mployment] O[pportunity] complaints" fall under the participation clause); *Uzoukwu v. Metro. Wash. COG*, 130 F. Supp. 3d 403, 416 (D.D.C. 2015) (indicating that the participation clause protects the employee's "legal efforts" against perceived discrimination (quoting *Harris v. D.C. Water & Sewer Auth.*, 922 F. Supp. 2d 30, 34 (D.D.C. 2013))).

The parties do not dispute that Ms. Wang never filed a discrimination complaint against WMATA through WMATA's internal processes. *See* Def.'s Statement ¶¶ 49–63 (describing Ms. Wang's interactions with WMATA's Office of Civil Rights without mentioning that Ms. Wang filed a discrimination complaint); Pl.'s Statement 35–40 (same). Thus, Title VII's "participation clause" protects only Ms. Wang's legal efforts, through external processes, to combat the discrimination that she perceived. The "participation clause" therefore extends to just Ms. Wang's EEOC Charge, filed on October 2, 2013, and her participation in the administrative and judicial proceedings that the EEOC charge triggered. *See* Am. Compl. ¶ 24 (indicating that Ms. Wang filed her EEOC Charge on October 2, 2013); Answer Am. Compl. ¶ 24 (same); *see also* Def.'s Statement Ex. 19, ECF No. 19-19 (reproducing the EEOC's Notice of Charge of Discrimination, issued to WMATA). Because Ms. Wang lodged an "official EEOC complaint[]," her EEOC charge was a protected activity under the "participation clause" for Title VII retaliation cases. Although WMATA contends that it did not receive notice of Ms. Wang's EEOC Charge until after her termination, the Court addresses that issue later, in the context of whether Ms. Wang can establish a causal link between the EEOC Charge and her termination. *See infra* Part IV.A.3.c.

The Court now turns to Ms. Wang's activities at WMATA to determine whether, within WMATA, she engaged in "opposition" activity that Title VII protects from retaliation. The Court examines Ms. Wang's activities at WMATA in three categories. As an initial matter, the Court finds that Ms. Wang took two actions at WMATA that, by virtue of how clearly they imply discrimination allegations, receive protection from retaliation under Title VII:

> (1) Ms. Wang's September 6, 2013 email to WMATA OIG Special Agent Mark
> Coulter, in which she asked whether Special Agent Coulter knew the contact
> information for WMATA's "EEO office"; and

> (2) Ms. Wang's September 22, 2013 email to Special Agent Coulter, in which she explicitly stated that "[she] believe[d] [that she was] being discriminated against because of [her] age, race and gender."

Def.'s Statement Ex. 18, ECF No. 19-18 (reproducing Ms. Wang's emails). Because "[n]ot every complaint garners its author protection under Title VII," a plaintiff in a retaliation case "must in some way allege unlawful discrimination" to engage in protected Title VII activity. *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Here, Ms. Wang's emails to Special Agent Coulter meet that standard and do allege discrimination: first indirectly, by seeking information about WMATA's internal office responsible for handling discrimination complaints; and then directly, by stating that she believed that she was "being discriminated against." *See* Def.'s Statement ¶ 52 ("If a matter concerns discrimination of any kind, it is referred to the EEO office"); Pl.'s Statement 35–40 (not disputing that the EEO office typically handles discrimination matters); *see also Broderick*, 437 F.3d at 1232 (noting that a plaintiff may have engaged in protected activity because she "did send a copy of her memo [complaining about her treatment] to an EEO official"); *Powell v. Lockhart*, 629 F. Supp. 2d 23, 39 (D.D.C. 2009) (holding that the plaintiff engaged in protected activity when she explicitly stated "that she believed that her performance review was discriminatory"). Although WMATA argues that Ms. Wang cannot establish causation—the third element of a Title VII retaliation claim—if Ms. Wang's retaliation claim relies on these protected activities, *see* Def.'s Mem. 22–23, the Court reserves discussion of that argument for later. *See infra* Part IV.A.3.c.

Ms. Wang also testified about another incident in which she explicitly communicated discrimination allegations to WMATA. In her deposition, Ms. Wang stated that, during her September 11, 2013 visit to WMATA's Office of Civil Rights and Human Resources, she said "I have a discrimination complaint" to an employee there. Wang Dep. 226:11–227:6, Pl.'s Statement Ex. 1, ECF No. 20-3. WMATA disputes this fact and alleges that "no one else can

corroborate Ms. Wang's claim that Ms. Wang mentioned discrimination" during that visit. *See* Def.'s Statement ¶ 57; Def.'s Resp. Statement 10, "Page 35 of 63," ¶ 3. Because the Court generally may not resolve disputed material facts on summary judgment, *see Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (holding that, on summary judgment, the Court must "eschew . . . weighing the evidence"), the Court assumes for now that Ms. Wang did explicitly allege discrimination during her September 11 visit to WMATA's Office of Civil Rights and Human Resources—and thus that her allegation there also qualifies as a protected activity for her retaliation claim. *See Powell*, 629 F. Supp. 2d at 39. *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that, on summary judgment, the Court must analyze all underlying facts and inferences in the light most favorable to the non-movant). As with Ms. Wang's emails to Special Agent Coulter, the Court postpones discussion of whether Ms. Wang can establish causation based on her September 11 allegation of discrimination. *See infra* Part IV.A.3.c (discussing causation).

Of the possible protected activities in this case, a final category encompasses certain actions that Ms. Wang took, by which Ms. Wang arguably "opposed" the events that led to her termination, but which did not include explicit mention of "discrimination" or "EEO" issues. Dividing this category of actions into three groups, the Court briefly recounts them before discussing whether they might be protected activities.

First, Ms. Wang emailed Ms. Audette on September 5, 2013 after the meeting in which Mr. Greaves announced that he wanted to transfer one of Ms. Wang's staff members to another WMATA component. *See* Pl.'s Statement Ex. 17, ECF No. 20-19 (reproducing the email). In her email, Ms. Wang stated that "[she] felt that [she was] being taken advantage of because [she does] not complain and just get[s] the job done" and that "[she was] not sure about [her] next

step," but hoped to discuss the matter with Ms. Audette at Ms. Audette's convenience. *Id.* Her email did not, however, explicitly allege unlawful discrimination based on Ms. Wang's race, sex, or national origin. *See id.*

Second, the next day, Ms. Wang and Mr. Greaves had a conversation, in which Ms. Wang suggested that she might hire a lawyer, and after which Ms. Wang had the impression of being terminated. Pl.'s Statement 26–27, ¶ 3; Def.'s Resp. Statement 8–9, "Page 25 of 63," ¶ 3. Ms. Wang alleges that, during their September 6 conversation, after Ms. Wang told Ms. Greaves that, because of his yelling and screaming, Mr. Greaves "seem[ed] to abuse [his] authority," Mr. Greaves replied that "[a]buse would be a word you would tell a lawyer." Wang Dep. 194:3–7, 206:2–6, 212:10–214:12, Pl.'s Statement Ex. 1, ECF No. 20-3. According to Ms. Wang, after she replied "[m]aybe," Mr. Greaves became very excited, pointed his finger to Ms. Wang's nose, and said "You're fired. You're fired. You're fired immediately." *Id.* at 214:12–20. Mr. Greaves disagrees with Ms. Wang's version of events but admits that Ms. Wang may have mentioned that she might retain an attorney because "[t]hat's the . . . normal retaliation speech that you would get." Greaves Dep. 147:16–150:18, Pl.'s Statement Ex. 3, ECF No. 20-5. Because the Court may not make credibility determinations or weigh the evidence on summary judgment, *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), the Court will view the record in the light most favorable to Ms. Wang and accept her version of events for purposes of this opinion. *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Ms. Wang does not, however, claim that she mentioned unlawful discrimination during the September 6 conversation. *See* Wang Dep. 212:10–214:20.

Third, Ms. Wang paid WMATA's OIG two visits, on September 6, 2013 and September 24, 2013. *See* Def.'s Statement Ex. 15 (reproducing an audio recording of Ms. Wang's OIG

interviews on those two dates). Ms. Wang does not mention unlawful discrimination in either of the two recorded interviews that took place during her OIG visits. *See* Def.'s Statement Ex. 15.

In determining whether these three groups of activities are activities that Title VII protects, the Court must heed the D.C. Circuit's directive that, "while no 'magic words' are required, the [plaintiff's] complaint [or actions] must in some way allege unlawful discrimination" to be protected activity. *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Thus, "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 128 (D.D.C. 2015) (quoting *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007)). Courts in this Circuit therefore require the plaintiff to communicate to the employer "alleged discriminatory conduct or ill-treatment based on her race, color, religion, sex, or national origin," or at least to require the plaintiff to allege that she believed that she was reporting discriminatory conduct. *Magowan v. Lowery*, No. 15-0917, 2016 WL 778351, at *18 (D.D.C. Feb. 29, 2016); *see also Richardson v. Petasis*, No. 13-0826, 2015 WL 8082244, at 29–31 (D.D.C. Dec. 7, 2015); *Uzoukwu v. Metro. Wash. COG*, 130 F. Supp. 3d 403, 416–17 (D.D.C. 2015); *Brooks v. Kerry*, 37 F. Supp. 3d 187, 197 n.4 (D.D.C. 2014). Although courts have held that protected "opposition" activity need not be an explicit discrimination complaint voiced by the plaintiff and communicated to her employer, the law requires, in the absence of such a complaint, that a Title VII plaintiff's "opposition" activity must in some way relate to allegations that would plainly signal discrimination if they were true. *See Clemmons*, 107 F. Supp. 3d at 128–32.[24]

---

[24] *Cf., e.g.*, *Crawford v. Metro. Gov't*, 555 U.S. 271, 277 (2009) (explaining that "opposition" to an employer's discriminatory practices could include "standing pat . . . by refusing to follow a supervisor's order to fire a junior worker for [explicitly] discriminatory

With these principles in mind, the Court determines that Ms. Wang's September 5 email to Ms. Audette, Ms. Wang's September 6 conversation with Mr. Greaves, and Ms. Wang's September 6 and September 24 OIG visits were not protected activities under Title VII. As noted above, none of these actions included explicit allegations of discrimination. Nor did they allege conduct that, if true, would plainly signal discrimination. Ms. Wang's September 5 email alleged that Ms. Wang was "being taken advantage of because [she does] not complain and just get[s] the job done." Pl.'s Statement Ex. 17, ECF No. 20-19. Even if Ms. Wang's allegation had been true, it would not necessarily imply discrimination. Any employee—regardless of his or her race, sex, or national origin—could raise a concern about inequitable distribution of work. *Broderick*, 437 F.3d at 1232 (noting that "complaining about being 'picked on,' without mentioning discrimination or otherwise indicating that gender was an issue, does not constitute protected activity, even if the employee honestly believes she is the subject of sex discrimination" (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727–28 (7th Cir. 2003))).

And even though Ms. Wang accused Mr. Greaves on September 6 of abusing his authority and indicated that she might hire a lawyer, Ms. Wang's statements were "untethered to an allegation that [Mr. Greaves's] conduct occurred because of [Ms. Wang's] membership in a protected class." *Clemmons*, 107 F. Supp. 3d at 130. Lacking that critical allegation, the statements merely alleged a "workplace complaint," not protected activity. *See id.* (explaining

---

reasons," such as when the employer fires the plaintiff "for failing to prevent his subordinate from filing an EEOC charge); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 414–15, 417–18 (4th Cir. 2015) (holding that, when an employee helped a colleague who made explicit sexual harassment allegations, the court may consider the employee's acts in the aggregate to determine whether they qualify as protected activities); *Collazo v. Bristol–Myers Squibb Mfg., Inc.*, 617 F.3d 39, 43–44, 47 (1st Cir. 2010) (holding that an employee who raised his subordinate's sexual harassment complaints to his supervisor—and explicitly noted that "this girl alleges that she is being sexually harassed"—opposed unlawful employment practices through his conduct).

that, in these circumstances, even "'somewhat magical' words like 'bias,' 'prejudice,' and 'hostile work environment[]'" do not make a plaintiff's statements protected Title VII activity).

Ms. Wang's OIG visits fail for the same reason: Because Ms. Wang never alleged unlawful discrimination under Title VII during those visits, her visits signaled only that she was reporting non-discriminatory "fraud, waste, or abuse," which is the kind of allegation that WMATA's OIG typically handles. *See* Def.'s Statement Ex. 15, at 27:33–40 (reproducing the audio file from Ms. Wang's September 6, 2013 interview with WMATA's OIG, in which Special Agent Coulter discusses the OIG's responsibilities). Indeed, this Court has explicitly held that "Title VII does not bar ill treatment because an employee complains to an inspector general . . . or because a manager engages in actions perceived as harassment after such an IG complaint." *Cole v. Boeing Co.*, 75 F. Supp. 3d 70, 78 (D.D.C. 2014); *see also Hunter v. District of Columbia*, 905 F. Supp. 2d 364, 379 (D.D.C. 2012) (holding that the Court cannot find an employee's OIG complaint to be protected activity when "nothing in the record demonstrates that [the] complaint . . . alleged discrimination on the basis of the characteristics protected by Title VII"). Thus, Ms. Wang's OIG visits, without more explicit discrimination allegations, are not protected activities under Title VII.

The Court summarizes its analysis of the first element of Ms. Wang's Title VII retaliation case (whether Ms. Wang engaged in protected activity under Title VII). First, Ms. Wang engaged in protected activity under the "participation clause" when she filed her EEOC Charge on October 2, 2013. Second, Ms. Wang engaged in protected activities under the "opposition" clause when she emailed Special Agent Coulter on September 6 and September 22, because she explicitly alleged discrimination and sought the contact information for WMATA's EEO office. Third, Ms. Wang engaged in further protected "opposition" activity when she allegedly made a

discrimination allegation at WMATA's Office of Civil Rights on September 11. But Ms. Wang's

September 5 email to Ms. Audette, Ms. Wang's September 6 conversation with Mr. Greaves, and

Ms. Wang's September 6 and September 24 OIG visits are not protected "opposition" activities

under Title VII, because they did not "in some way allege unlawful discrimination." *Broderick*,

437 F.3d at 1232. The Court now turns to the second and third retaliation elements.

### b. *Materially Adverse Action*

To establish the second element of a Title VII retaliation claim, the plaintiff must show

that her employer took a materially adverse action against her. *McGrath v. Clinton*, 666 F.3d

1377, 1380 (D.C. Cir. 2012). Just as WMATA argued that Ms. Wang's written warnings and

corrective action plan cannot be adverse employment actions for purposes of Ms. Wang's

discrimination claims, WMATA argues that they cannot be materially adverse actions for

purposes of her Title VII retaliation claim. *See* Def.'s Mem. 9–12, 18. Ms. Wang does not argue

otherwise, *see* Pl.'s Opp'n 32–37, and so the Court finds that Ms. Wang's written warnings and

corrective action plan are not materially adverse actions upon which Ms. Wang may base her

Title VII retaliation claim. *See Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F.

Supp. 2d 15, 25 (D.D.C. 2003) ("[W]hen a plaintiff files an opposition to a dispositive motion

and addresses only certain arguments raised by the defendant, a court may treat those arguments

that the plaintiff failed to address as conceded."). On the other hand, Ms. Wang's termination is,

of course, a materially adverse action on which she can base her retaliation claim. *See Baird v.

Gotbaum*, 662 F.3d 1246, 1248–49 (D.C. Cir. 2011) (explaining that "the 'adverse action'

concept has a broader meaning" in the retaliation context, so that it encompasses at least the

"hiring, firing, failing to promote, reassignment with significantly different responsibilities,

or . . . significant change in benefits" that are adverse employment actions in the discrimination

context (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009))).

*c. Causation*

The third element of a Title VII retaliation claim requires the employee to show "that the employer took a materially adverse action against the employee 'because' the employee opposed a protected practice." *McGrath v. Clinton*, 666 F.3d 1877, 1383 (D.C. Cir. 2012). To survive summary judgment, therefore, the employee "must demonstrate that there is a genuine issue of material fact as to whether retaliatory animus was *the* cause" for the employer's materially adverse action. *Rattigan v. Holder*, 982 F. Supp. 2d 69, 81 (D.D.C. 2013). Title VII retaliation claims have a higher causation standard than Title VII discrimination claims: "Title VII retaliation claims must be proved according to traditional principles of but-for causation," not the motivating-factor standard applicable to discrimination claims. *Univ. Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). The employee must therefore prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"—or, in other words, that the retaliation would not have occurred for any reason other than the employee's opposition to the employer's discriminatory conduct. *Id.* To meet this burden, the employee can offer both direct and circumstantial evidence "from which a reasonable jury could infer the employer's retaliatory intent." *McGrath*, 666 F.3d at 1383.

Before analyzing whether Ms. Wang can establish causation, the Court first recounts the timeline of events leading to Ms. Wang's termination that are relevant to this inquiry, with Ms. Wang's protected activities italicized:

(1)   September 5: Ms. Wang attended a meeting with Mr. Greaves and others, at which Mr. Greaves sought to move one of Ms. Wang's subordinates to another WMATA component.[25]

---

[25] *See generally* Am. Compl. ¶ 140; Answer Am. Compl. ¶ 140; Pl.'s Statement Ex. 17, ECF No. 20-19.

(2)    September 5: Ms. Wang conveyed her account of the meeting by email to Ms. Audette. Mr. Greaves received notice of Ms. Wang's email because Ms. Audette forwarded the email to him.[26]

(3)    September 6: Mr. Greaves gave Ms. Wang her first written warning. Mr. Greaves allegedly told Ms. Wang that she was fired, after Ms. Wang accused Mr. Greaves of abusing his authority and after Ms. Wang mentioned that she might hire an attorney.[27]

(4)    September 6: Ms. Wang visited WMATA's OIG. At some point after this visit or after Ms. Wang's previous OIG visit, and potentially before Ms. Wang was terminated, Mr. Greaves heard "a rumor" about Ms. Wang complaining to "HR or OIG."[28]

(5)    *September 6: Ms. Wang emailed Special Agent Coulter and asked for the contact information for WMATA's "EEO office."[29]*

(6)    *September 11: Ms. Wang stated that she had "a discrimination complaint" to an employee at WMATA's Office of Civil Rights and Human Resources.[30]*

(7)    September 11: Mr. Greaves gave Ms. Wang her second written warning and placed her on a corrective action plan.[31]

(8)    *September 22: Ms. Wang emailed Special Agent Coulter and alleged that she believed that she was "being discriminated against because of my age, race and gender."[32]*

(9)    September 24: Ms. Wang visited WMATA's OIG once more.[33]

---

[26] *See* Pl.'s Statement Ex. 17, ECF No. 20-19 (reproducing Ms. Wang's email to Ms. Audette); Def.'s Statement Ex. 12/13, at 488–89, ECF No. 19-14 (reproducing Ms. Audette's email to Mr. Greaves).

[27] *See* Def.'s Statement ¶ 32; Pl.'s Statement 3, ¶ 12; Wang Dep. 194:3–7, 206:2–6, 212:10–214:20, Pl.'s Statement Ex. 1, ECF No. 20-3.

[28] *See* Def.'s Statement ¶ 35; Pl.'s Statement 3, ¶ 14; *id.* at 30, ¶ 1; Def.'s Resp. Statement 9, "Page 30 of 63," ¶ 1; Greaves Dep. 239:1–240:3, Pl.'s Statement Ex. 3, ECF No. 20-5.

[29] *See* Def.'s Statement Ex. 18, ECF No. 19-18.

[30] *See* Wang Dep. 226:11–227:6, Pl.'s Statement Ex. 1, ECF No. 20-3.

[31] *See* Def.'s Statement ¶ 47; Pl.'s Statement 3, ¶ 16; *id.* at 40, ¶ 18; Def.'s Resp. Statement 11, ¶ 18.

[32] *See* Def.'s Statement Ex. 18.

[33] *See* Pl.'s Statement 41, ¶ 3; Def.'s Resp. Statement 11, ¶ 3.

*(10)  October 2: Ms. Wang filed an EEOC Charge.*[34]

(11)  October 10: WMATA terminated Ms. Wang's employment.[35]

*(12)  October 17: WMATA received Ms. Wang's EEOC Charge.*[36]

Ms. Wang's termination on October 10 (item (11) above) is the only materially adverse action in this case. *See supra* Part IV.A.3.b.

Having recounted the timeline of events, the Court can now address WMATA's argument that, because Mr. Greaves had no knowledge of Ms. Wang's protected activities, those activities could not have caused Mr. Greaves's decision to terminate Ms. Wang's employment. To show causation, the plaintiff must show that the employer "had knowledge of her protected activity, and that the adverse personnel action took place shortly after that activity." *Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (brackets and internal quotation marks omitted) (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985)). A plaintiff's supervisor thus could not have retaliated against the plaintiff unless he "had knowledge of [her] protected activity." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009). Likewise, "an adverse employment action that was already contemplated before a plaintiff engaged in protected activity cannot be evidence of retaliation." *Terveer v. Billington*, 34 F. Supp. 3d 100, 119 (D.D.C. 2014) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001)).

With respect to Ms. Wang's protected activity under the "participation clause"—her EEOC charge and any subsequent proceedings before the EEOC or this Court—the parties agree that Ms. Wang was terminated *before* WMATA received notice of Ms. Wang's EEOC Charge.

[34] *See* Am. Compl. ¶ 24; Answer Am. Compl. ¶ 24; Pl.'s Statement 41, ¶ 6; Def.'s Statement 11, "Page 41 of 63," ¶ 6.

[35] *See* Def.'s Statement ¶¶ 1, 72; Pl.'s Statement 1, ¶ 1; *id.* at 3, ¶ 23.

[36] *See* Def.'s Statement ¶ 61; Pl.'s Statement 3, ¶ 21; Def.'s Statement Ex. 19, ECF No. 19-19.

*See* Def.'s Statement ¶ 61; Pl.'s Statement 3, ¶ 21; *see also* Def.'s Statement Ex. 19, ECF

No. 19-19 (reproducing the EEOC's Notice of Charge of Discrimination, which was stamped as

received by WMATA on October 17, 2013—a week after Ms. Wang's termination on October

10, 2013). On this record, WMATA could not have known about Ms. Wang's EEOC Charge

until after her termination, and hence WMATA's knowledge about Ms. Wang's EEOC Charge

could not have caused her termination. Thus, for any retaliation claim based on the EEOC

Charge and the proceedings that it triggered, Ms. Wang cannot establish the causation element

that is necessary for her Title VII retaliation claim.

Ms. Wang faces a similar problem for her other protected activities. The record supports

WMATA's contention that Mr. Greaves did not know about Ms. Wang's September 6 or

September 22 emails to Special Agent Coulter, in which she alleged discrimination. *See* Greaves

Dep. 239:1–12, Pl.'s Statement Ex. 3, ECF No. 20-5 (stating that no one ever formally contacted

Mr. Greaves about Ms. Wang's complaints to "HR or OIG or any other place"); Pl.'s Statement

42–44 (omitting any claim that Mr. Greaves knew about Ms. Wang's email correspondence with

Special Agent Coulter). Likewise, no record evidence indicates that Mr. Greaves thought that

Ms. Wang had explicitly alleged discrimination during her September 11 visit to WMATA's

Office of Civil Rights. *See* Greaves Dep. 264:9–265:16 (indicating that, even though he had

heard rumors about Ms. Wang's visit to "HR or OIG," Mr. Greaves did not know the content of

Ms. Wang's complaints); Pl.'s Statement 42–44 (omitting any claim that Mr. Greaves knew

about the content of Ms. Wang's complaints to WMATA's Office of Civil Rights).

"To survive summary judgment, however, [the plaintiff] needn't provide direct evidence

that [her] supervisors knew of [her] protected activity; [she] need only offer circumstantial

evidence that could reasonably support an inference that they did." *Jones v. Bernanke*, 557 F.3d

670, 679 (D.C. Cir. 2009); *accord Kacian v. Postmaster Gen.*, No. 15-1952, 2016 WL 3509564, at *4 (3d Cir. June 27, 2016); *Román v. Castro*, No. 12-1321, 2016 WL 829874, at *10 (D.D.C. Mar. 1, 2016). "[T]hat 'the *employer* had knowledge of the employee's protected activity and the adverse personnel action took place shortly after that activity'" can be "adequate to permit an inference of retaliatory motive" on the part of a *supervisor*. *Jones*, 557 F.3d at 679 (emphasis in original) (internal quotation marks omitted) (quoting *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006)).

Here, assuming Ms. Wang's version of the facts to be true for purposes of this opinion, Ms. Wang can meet this standard and show (1) that her employer had knowledge of her protected activities, and (2) that the adverse personnel action took place shortly after those activities. The record shows that the employer (WMATA) had knowledge of Ms. Wang's protected activity because Ms. Wang had raised explicit discrimination allegations to WMATA's employees.[37] And because WMATA terminated Ms. Wang within five weeks of all her protected activities, her termination "took place shortly after" her protected activities. *Jones*, 557 F.3d at 679.[38]

The record thus supports an inference that Ms. Wang's supervisor, Mr. Greaves, knew about Ms. Wang's protected activity because he terminated her shortly after Ms. Wang's

---

[37] *See* Wang Dep. 226:11–227:6, Pl.'s Statement Ex. 1, ECF No. 20-3 (stating that on September 11 Ms. Wang told employees at WMATA's Office of Civil Rights and Human Resources that she wanted to file a discrimination complaint); Def.'s Statement Ex. 18, ECF No. 19-18 (showing that Ms. Wang asked WMATA Special Agent Mark Coulter about WMATA's "EEO office" on September 6, and that Ms. Wang told Special Agent Coulter that she believed that she was "being discriminated against because of [her] age, race and gender" on September 22).

[38] *See* Def.'s Statement Ex. 1, ECF No. 19-3 (showing that Ms. Wang's termination letter issued on October 10). *See generally Mamantov v. McCarthy*, 142 F. Supp. 3d 24, 33–34 (D.D.C. 2015) ("Courts in this Circuit have generally accepted as adequate intervals of a few days up to a few months." (citations and internal quotation marks omitted)).

employer, WMATA, learned about her protected activity. And even though circumstantial evidence of temporal proximity is most persuasive "at the prima facie stage," evidence that supports a prima facie case "tends to support a circumstantial inference of retaliation" and therefore "applies to the ultimate inquiry as well." *Jones*, 447 F.3d at 679. "[I]f such evidence can support an inference of actual retaliatory motive, it necessarily can support an inference of mere knowledge." *Id.*

Beyond temporal proximity, additional circumstantial evidence exists that reasonably supports an inference that Mr. Greaves knew about at least one of Ms. Wang's protected activities: Belinda Press, a WMATA employee relations officer, attended the September 11 meeting in which Ms. Wang received her corrective action plan from Mr. Greaves. And circumstances surrounding that meeting indicate that Ms. Press could have told Mr. Greaves about the discrimination allegation that Ms. Wang claims to have made at WMATA's Office of Civil Rights and Human Resources. Below, the Court discusses the evidence supporting this theory of events.

The record shows that Mr. Greaves was aware of at least one of Ms. Wang's visits to WMATA's OIG or to WMATA's human resources department, even if he was not aware of what she stated during that visit. *See* Greaves Dep. 239:1–240:3 (admitting that Mr. Greaves heard a "rumor about [Ms. Wang] complaining to HR or OIG"). During his deposition, Mr. Greaves stated that he did not know when he had become aware of Ms. Wang's visits to OIG or to the human resources department, but Mr. Greaves did admit that "it could have been before" Ms. Wang's termination. *See id.* Mr. Greaves could have learned about Ms. Wang's September 11 visit to WMATA's Office of Civil Rights and Human Resources, thus, at any time between the time the visit occurred and Ms. Wang's termination on October 10.

The record also shows that, later in the day after Ms. Wang's September 11 visit to WMATA's Office of Civil Rights and Human Resources, Mr. Greaves issued Ms. Wang a second written warning and a corrective action plan. *See* Wang Dep. 238:12–242:1, Pl.'s Statement Ex. 1, ECF No. 20-3 (describing how Ms. Wang received the second written warning and the corrective action plan at a 4:30 PM meeting with Mr. Greaves and WMATA Employee Relations Officer Belinda Press); Pl.'s Statement Ex. 22, ECF No. 20-24 (showing that, on September 11 before Ms. Wang's 4:30 PM meeting with Mr. Greaves, Ms. Wang had established contact with Belinda Press from WMATA's Office of Civil Rights and Human Resources). But the meeting was not just between Mr. Greaves and Ms. Wang. A third person attended: Belinda Press, the very person, based on Ms. Wang's version of events, to whom Ms. Wang had been referred at WMATA's Office of Civil Rights and Human Resources. *See* Wang Dep. 226:14–229:5 (stating that Ms. Wang met Ms. Press during her September 11 visit to the Office of Civil Rights and Human Resources); *id.* at 238:12–242:1 (stating that Ms. Press was present at the meeting in which Ms. Wang received her corrective action plan). What is more, Ms. Press was the same person to whom, immediately before the 4:30 PM meeting with Mr. Greaves, Ms. Wang had been communicating concerns about Mr. Greaves's management. *See* Pl.'s Statement Ex. 22 (showing that Ms. Wang emailed Ms. Press about Mr. Greaves at 4:03 PM on September 11).

The record thus indicates that one person—Belinda Press—both knew the details Ms. Wang's discrimination allegations and had the opportunity to communicate them to Mr. Greaves. Indeed, Ms. Press has stated that, to review the corrective action plan, she may have met with Mr. Greaves before the 4:30 PM meeting in which Mr. Greaves issued Ms. Wang the corrective action plan. *See* Press Dep. 54:8–55:12, Def.'s Statement Ex. 17, ECF No. 19-17.

Given that Mr. Greaves admits to hearing that Ms. Wang visited WMATA's OIG or WMATA's Office of Civil Rights and Human Resources, *see* Greaves Dep. 239:1–240:3, a reasonable jury could reasonably infer that Ms. Press conveyed the information about Ms. Wang's visit to Mr. Greaves. And a reasonable jury could reasonably infer that, if Ms. Press communicated information about Ms. Wang's visit to Ms. Press's office, then Ms. Press also communicated what Ms. Wang allegedly said during that visit—that Ms. Wang sought to lodge a discrimination complaint. *See* Wang Dep. 226:11–227:6. Given Ms. Press's multiple possible interactions with Mr. Greaves in connection to Ms. Wang, the record would sufficiently support a reasonable jury's inference that Mr. Greaves learned (from Ms. Press) about Ms. Wang's explicit allegation of discrimination, voiced at WMATA's Office of Civil Rights and Human Resources.

In light of WMATA's knowledge of Ms. Wang's protected activity, the temporal proximity between Ms. Wang's protected activity and her termination, and circumstantial evidence from which a reasonable jury could infer that Mr. Greaves knew about at least one of Ms. Wang's protected activities, the Court determines that Ms. Wang has sufficient record evidence to refute the argument that Mr. Greaves had no knowledge of Ms. Wang's protected activities. *See* Def.'s Mem. 18–23 (making that argument). *See generally Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (explaining that, to show causation, the plaintiff must show that the employer "had knowledge of her protected activity" (brackets and internal quotation mark omitted) (quoting *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985))). But this determination does not conclude the causation inquiry. After all, the causation element of a Title VII retaliation claim requires the employee to show "that the employer took a materially adverse action against the employee 'because' the employee opposed a protected practice." *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012). Simply showing the employer's knowledge of

the employee's protected practice and the employer's later materially adverse action does not fully meet that standard; the employee must also show the materially adverse action "would not have occurred in the absence of" the employee's protected practice. *Univ. Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). The Court turns now to the evidence Ms. Wang offers to show Mr. Greaves's retaliatory animus.

The Court begins with Ms. Wang's "direct evidence" of retaliation. *See* Pl.'s Opp'n 36. Direct evidence of retaliation may be an employer policy that is retaliatory on its face, or an employer statement that explicitly mentions an employee's protected activity. *See, e.g.*, *Lane v. Vasquez*, 961 F. Supp. 2d 55, 75 (D.D.C. 2013) (holding that the employer's comment that the employee "filed an EEO complaint and would never be hired is direct evidence of retaliation"); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 53 (D.D.C. 2011) (finding a sworn affidavit to be direct evidence of retaliation when it stated that a supervisor informed another employee that the plaintiff "was not being sent overseas in November 2004 because of his EEO complaint"). *See generally, e.g.*, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121–22 (1985) (explaining that a policy that was discriminatory on its face was direct evidence of discrimination); *Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 576–77 (D.C. Cir. 2013) (per curiam) (finding that the employer's reference to the employee's status as a "young black man" was direct evidence of discrimination). If the employee has direct evidence of retaliation, she need not make out a prima facie case, *see Thurston*, 469 U.S. at 121, and she is entitled to a jury trial, *see Ayissi–Etoh*, 712 F.3d at 576–77.

Here, Ms. Wang asserts that Mr. Greaves's "retaliatory animus beg[an] when [Ms.] Wang sa[id] she [might] consult an attorney and continue[d] through to his deposition testimony," and that "[Mr.] Greaves's documented anger at [Ms.] Wang compels denial of summary judgment on

[Ms.] Wang's Title VII retaliation count." Pl.'s Opp'n 36. The record does reflect Mr. Greaves consistent irritation with Ms. Wang's actions, particularly those actions that he felt might lead to legal activity. Immediately after reading Ms. Wang's September 5 email about their meeting earlier that day, Mr. Greaves believed that Ms. Wang wanted to "create a case" against him, and he said so in two emails he sent on that same day. *See* Def.'s Statement Ex. 12/13, at 487–89, ECF No. 19-14. And on that very day, he recommended Ms. Wang's termination. *Id.* at 487–88. Furthermore, on multiple occasions during his deposition, Mr. Greaves expressed his belief that Ms. Wang was telling "a complete lie . . . to set up her little case." *See* Greaves Dep. 138:1–14, 147:16–150:14, Pl.'s Statement Ex. 3, ECF No. 20-5. *See generally* 1 Lex K. Larson & Arthur Larson, *Larson on Employment Discrimination* § 8.07 (2d ed. 2016) ("Discriminatory [or retaliatory] comments may establish a prima facie case even if occurring after the adverse employment action." (citing *Ridgell v. Colvin*, No. 10-3280, 2013 WL 952253 (D. Md. Mar. 11, 2013)). Finally, according to Ms. Wang, when Mr. Greaves became agitated after Ms. Wang accused him of abusing his authority, Mr. Greaves replied that "[a]buse would be a word you would tell a lawyer" and then told Ms. Wang that she was fired. Wang Dep. 212:10–214:20, Pl.'s Statement Ex. 1, ECF No. 20-3.[39]

The record thus reveals several instances in which Mr. Greaves showed awareness of and irritation toward the possibility that Ms. Wang might pursue legal action against him. However, Mr. Greaves's statements never specifically addressed the possibility that Ms. Wang might lodge

---

[39] As discussed above, *see supra* Part IV.A.3.a, although Mr. Greaves disagrees with Ms. Wang's version of events, the Court will assume that Ms. Wang's version of events is accurate for purposes of this opinion. *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (explaining that the Court must analyze all underlying facts and inferences in the light most favorable to the non-movant); *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (explaining that the Court may not make credibility determinations or weigh the evidence on summary judgment).

*discrimination allegations* against him. For that reason, Mr. Greaves's statements are not the

kind of direct evidence that ensures Ms. Wang a jury trial on her retaliation claim. *Cf.*

*Ayissi–Etoh v. Fannie Mae*, 712 F.3d 572, 576–77 (D.C. Cir. 2013) (per curiam) (holding that a

statement that specifically invoked the plaintiff's protected class was direct evidence that entitled

the plaintiff to a jury trial on his discrimination claims); *Lane v. Vasquez*, 961 F. Supp. 2d 55, 75

(D.D.C. 2013) (holding that a statement that specifically invoked the plaintiff's EEO complaint

was direct evidence that entitled the plaintiff to a jury trial on his retaliation claim); *Hampton v.*

*Vilsack*, 760 F. Supp. 2d 38, 53 (D.D.C. 2011) (same). The Court will, however, consider

Mr. Greaves's statements as indirect evidence of Mr. Greaves's retaliatory animus.

To assess whether indirect evidence of retaliation suffices to show that WMATA

terminated Ms. Wang "because" she opposed discriminatory conduct, the Court engages in the

same analysis it did for Ms. Wang's indirect evidence of discrimination: the Court considers

whether "the employee produced sufficient evidence for a reasonable jury to find that the

employer's asserted non-retaliatory reason was not the actual reason and that the employer

intentionally retaliated against the employee in violation of Title VII." *McGrath v. Clinton*, 666

F.3d 1377, 1383 (D.C. Cir. 2012) (brackets and internal quotation marks omitted) (quoting

*Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011)). As discussed before, circumstantial

evidence supports the idea that Mr. Greaves might have known about Ms. Wang's protected

activity at the time that he issued her corrective action plan. *See supra* (discussing how Ms. Press

was allegedly aware of Ms. Wang's discrimination allegations against Mr. Greaves and might

have also met with Mr. Greaves before Mr. Greaves issued Ms. Wang her corrective action

plan). And, as also noted before, the goals and deadlines in Ms. Wang's corrective action plan

call its fairness and impartiality into doubt. *See supra* Part IV.A.2.c. Those circumstances,

combined with Mr. Greaves's statements showing his irritation toward any legal action from Ms. Wang, might leave a reasonable jury with the impression that Mr. Greaves imposed an unfair corrective action plan, ensured that Ms. Wang performed poorly on it, and ultimately terminated Ms. Wang in retaliation for her intent to file a discrimination suit against WMATA. *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3 290, 296 (D.C. Cir. 2015) (explaining that a plaintiff may establish pretext with evidence that "[a]n employer's [pre-termination] investigation . . . is so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination [or retaliation]" (citing *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 855 (D.C. Cir. 2006))); *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008) (noting that a plaintiff can also point to "discriminatory [or retaliatory] statements by the decisionmaker"). A reasonable jury could further buttress an inference of retaliation with the observation that Ms. Wang's termination came within five weeks of both instances in which allusions to legal action provoked a reaction from Mr. Greaves.[40] Because a reasonable jury could infer retaliation here, the Court must deny WMATA's motion for summary judgment on Ms. Wang's Title VII retaliation claim.

---

[40] *Compare* Def.'s Statement Ex. 12/13, at 488–89, ECF No. 19-14 (showing that Mr. Greaves believes that Ms. Wang was attempting to "create a case" when she emailed Ms. Audette about the meeting in which Mr. Greaves suggested Mr. Julia's transfer); Wang Dep. 194:3–7, 206:2–6, 212:10–214:20, Pl.'s Statement Ex. 1, ECF No. 20-3 (indicating that Mr. Greaves accused Ms. Wang of using the word "abuse" because "[a]buse would be a word you would tell a lawyer" on September 6, 2013), *with* Def.'s Statement Ex. 1, ECF No. 19-3 (showing that Ms. Wang was terminated less than five weeks later, on October 10, 2013). *See generally Hamilton v. Geithner*, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012) (explaining that temporal proximity can support an inference of causation, and analyzing the facts of the case to find that, when "the period between . . . statutorily protected activity and the adverse employment action is just under three months," "just two months," or "one month later," the plaintiff provided sufficient evidence to infer retaliation).

Until now, the Court has discussed the causation element of Ms. Wang's Title VII retaliation claim under the D.C. Circuit's directive that a plaintiff's supervisor could not have retaliated against the plaintiff unless he "had knowledge of [her] protected activity." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009). But the Court notes here that, in the Title VII *discrimination* context, some courts—including the Supreme Court—have held that the employer's knowledge of a plaintiff's protected class is not required for a successful Title VII discrimination claim: "When evaluating causation in a Title VII case, the question is not what the employer *knew* about the employee's religious beliefs [or the employee's protected class]. . . . Instead, the critical question is what *motivated* the employer's employment decision." *Nobach v. Woodland Vill. Nursing Ctr., Inc.*, 799 F.3d 374, 378 (5th Cir. 2015) (citing *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015)); *accord Mendoza v. Roman Catholic Archbishop of L.A.*, No. 14-55651, 2016 WL 3165856, at *2 (9th Cir. June 7, 2016) ("Knowledge is not a requirement of a Title VII claim." (citing *Abercrombie*, 135 S. Ct. at 2032–33)).

In the Supreme Court's words, Title VII's "intentional discrimination provision prohibits certain *motives*, regardless of the state of the actor's knowledge." *Abercrombie*, 135 S. Ct. at 2033. "Motive and knowledge are separate concepts." *Id.* And the Supreme Court has recently reached a similar holding in the First Amendment retaliation context: "When an employer demotes an employee out of a desire to prevent the employee from engaging in political activity that the First Amendment protects, the employee is entitled to challenge that unlawful action under the First Amendment and 42 U.S.C. § 1983—even if . . . the employer makes a factual mistake about the employee's behavior." *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016). *See generally Smith v. City of Greensboro*, No. 15-11643, 2016 WL 1425953, at *6 (11th

Cir. Apr. 12, 2016) (applying the same causation principles for the plaintiff's Title VII and First Amendment retaliation claims); *Martin v. District of Columbia*, 78 F. Supp. 3d 279, 327 n.74 (D.D.C. 2015) (same).

To the Court's knowledge, no court has squarely held that a plaintiff may prove Title VII *retaliation* based solely on a supervisor's retaliatory motive, without having to establish the supervisor's knowledge of the plaintiff's protected activity. But such a holding is the logical extension of the Supreme Court's statutory analysis in *Abercrombie*, which observed that 42 U.S.C. § 2000e-2(a)(1)—the provision governing Title VII discrimination—"does not impose a knowledge requirement," even though "some antidiscrimination statutes do." *Abercrombie*, 135 S. Ct. at 2032–33; *see also* 42 U.S.C. § 2000e-2(a) (stating that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin," but not because of the employer's *knowledge* of the individual's race, color, religion, sex, or national origin). Title VII's antiretaliation provision, just like Title VII's antidiscrimination provision, imposes no knowledge requirement. *See* 42 U.S.C. § 2000e-3(a) (stating that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice," not because *the employer knows* that the employee has opposed any practice made an unlawful employment practice). To prove that a supervisor unlawfully retaliated against the plaintiff, the plaintiff arguably need only to prove that the supervisor harbored unlawful retaliatory intent—not that he harbored unlawful retaliatory intent *and* that he knew about the plaintiff's protected activity.

Here, because the Court finds that circumstantial evidence exists from which a reasonable jury could infer Mr. Greaves's knowledge of one of Ms. Wang's protected activities, the Court

need not analyze Ms. Wang's claim under this alternative method of proving causation. The Court observes, however, that record evidence exists that suggests that, even before Mr. Greaves could have had knowledge of Ms. Wang's protected activities (and even if Mr. Greaves did not have knowledge of those activities), Mr. Greaves harbored retaliatory animus toward Ms. Wang.[41] And additional circumstantial evidence in this case suggests that Mr. Greaves's hostility arose from the concern that Ms. Wang would file discrimination allegations: In today's workplace climate, if an employee (1) is in a protected class, (2) has expressed dissatisfaction with an adverse personnel action taken against her, (3) appears to be building a case against her manager, (4) has stated that she may hire a lawyer as a result of her dissatisfaction with the adverse personnel action, and (5) has visited her employer's human resources department to discuss the same adverse personnel action, then the manager that took action against that employee would logically suspect that her complaint is discrimination-related (in particular where the employee is an at-will employee with almost no other legal options). All of these parameters, of course, apply here.[42] Thus, it is plausible that Mr. Greaves mistakenly sought to

---

[41] *See* Def.'s Statement Ex. 12/13, at 488–89, ECF No. 19-14 (showing that, after reading Ms. Wang's September 5 email about the meeting in which Mr. Greaves sought to transfer Mr. Julia, Mr. Greaves immediately believed that Ms. Wang wanted to "create a case" against him); Wang Dep. 194:3–7, 206:2–6, 212:10–214:12, Pl.'s Statement Ex. 1, ECF No. 20-3 (alleging that Mr. Greaves told Ms. Wang that she was "fired immediately" after she said that she might hire a lawyer); Greaves Dep. 147:16–150:18, Pl.'s Statement Ex. 3, ECF No. 20-5 (opining that statements about hiring an attorney are typical in "the . . . normal retaliation speech that you would get").

[42] *See* Am. Compl. ¶¶ 2, 140 (noting that Ms. Wang is a Chinese-American female, and that on September 5, 2013, Mr. Greaves sought to move one of her subordinates to a different WMATA component); Answer Am. Compl. ¶¶ 2, 140 (same); Def.'s Statement Ex. 12/13, at 488–89, ECF No. 19-14 (showing that Ms. Wang emailed her second-line supervisor about Mr. Greaves's actions on September 5, 2013, and that Mr. Greaves thought that Ms. Wang was "creating a case"); Wang Dep. 194:3–7, 206:2–6, 212:10–214:20, Pl.'s Statement Ex. 1, ECF No. 20-3 (indicating that Ms. Wang told Mr. Greaves on September 6, 2013 that she might hire a lawyer); Greaves Dep. 239:1–240:3, Pl.'s Statement Ex. 3, ECF No. 20-5 (indicating that Mr. Greaves had heard a rumor that Ms. Wang had visited WMATA's OIG or WMATA's

retaliate against Ms. Wang for engaging in activity protected in Title VII, even though she did not actually engage in such activity. And such mistaken retaliatory act may be actionable. But the Court is hesitant to reach such a conclusion without further briefing.

Having momentarily digressed, the Court returns to—and recaps—its analysis of Ms. Wang's Title VII retaliation claim. As discussed above, Ms. Wang engaged in certain protected Title VII activities during her last five weeks at WMATA, and WMATA terminated her employment shortly after most of those activities took place. *See supra* Part IV.A.3.a–b. And sufficient evidence exists to allow a reasonable jury to infer (1) that Ms. Wang's supervisor, Mr. Greaves, knew about at least one of Ms. Wang's protected activities; and (2) that Mr. Greaves terminated Ms. Wang's employment because Ms. Wang engaged in that protected activity. *See supra*. Because a reasonable jury could therefore find for Ms. Wang on each element of her Title VII retaliation claim, the Court will deny WMATA's motion for summary judgment on the Title VII retaliation claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."); *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012) ("To prove unlawful retaliation, a plaintiff must show: (1) that [she] opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against [her]; and (3) that the employer took the action 'because' the employee opposed the practice.").

---

human resources department); *see also Bible Way Church of Our Lord Jesus Christ of Apostolic Faith of Washington, D.C. v. Beards*, 680 A.2d 419, 432–33 (D.C. 1996) ("In the District of Columbia, where there is no clear expression of an intent to enter into a contract for a fixed period, we recognize a presumption that 'the parties have in mind merely the ordinary business contract for a continuing employment, terminable at the will of either party.'" (quoting *Sullivan v. Heritage Found.*, 399 A.2d 856, 860 (D.C. 1979))).

## B. ARRA Retaliation Claim

The Court concludes its consideration of WMATA's summary judgment motion by addressing Ms. Wang's retaliation claim under the American Recovery and Reinvestment Act of 2009 (ARRA). *See* Am. Compl. ¶¶ 221–30. The ARRA, "popularly known as the Stimulus Act, was passed as emergency legislation to rescue the American economy from the recent deep recession." *Dorsey v. Jacobson Holman, PLLC*, 707 F. Supp. 2d 21, 23 (D.D.C. 2010). The Act appropriated federal funds to "promote economic recovery," among other things. ARRA, Pub. L. No. 111-5, § 3(a)(1), 123 Stat. 115, 116 (2009). To promote accountability and transparency in the use of those funds, the ARRA includes a whistleblower provision that protects employees who disclose

> information that the employee reasonably believes is evidence of—
> (1) gross mismanagement of an agency contract or grant relating to covered funds;
> (2) a gross waste of covered funds;
> (3) a substantial and specific danger to public health or safety related to the implementation or use of covered funds;
> (4) an abuse of authority related to the implementation or use of covered funds; or
> (5) a violation of law, rule, or regulation related to an agency contract (including the competition for or negotiation of a contract) or grant, awarded or issued relating to covered funds.

*Id.* ¶ 1553(a), 123 Stat. at 297. The ARRA's whistleblower provision declares that those employees "may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing" that information, even if they make their disclosures "in the ordinary course of [their] duties." *Id.*

"To recover under ARRA's whistleblower provision, a plaintiff must prove by a preponderance of the evidence . . . (1) [that she] made a protected disclosure, (2) [that she] suffered a reprisal, and (3) [that] the protected disclosure was a contributing factor in the reprisal." *Hadley v. Duke Energy Progress, Inc.*, No. 14-0229, 2016 WL 1071098, at *4

(E.D.N.C. Mar. 17, 2016) (citing ARRA § 1553(a), (c)(1)(A), 123 Stat. at 297, 299). To prove that a protected disclosure was a contributing factor, the plaintiff may use "circumstantial evidence, including . . . (I) evidence that the official undertaking the reprisal knew of the disclosure; or (II) evidence that the reprisal occurred within a period of time after the disclosure such that a reasonable person could conclude that the disclosure was a contributing factor in the reprisal." ARRA § 1553(c)(1)(A)(ii), 123 Stat. at 299. If a plaintiff proves the three elements of an ARRA whistleblower claim, the employer can rebut the claim with clear and convincing evidence "that the employer would have taken the action constituting the reprisal in the absence of the disclosure." *Hadley*, 2016 WL 1071098, at *4 (brackets and internal quotation marks omitted) (quoting ARRA § 1553(c)(1)(B), 123 Stat. at 299).

Here, WMATA argues that Ms. Wang cannot prevail on her ARRA retaliation claim because

(1) Ms. Wang cannot establish that any whistleblowing disclosures she made were related to funds specified in the ARRA,

(2) Ms. Wang did not make disclosures that the ARRA's whistleblower provision protects, and

(3) Ms. Wang cannot show that any protected disclosures caused her termination.

*See* Def.'s Mem. 30. Because the Court finds that WMATA's second argument suffices to award WMATA summary judgment on Ms. Wang's ARRA retaliation claim, the Court addresses that argument without addressing the other two.

When a plaintiff's disclosure "concerns mismanagement, waste, or an abuse of ARRA funds," ARRA protects the plaintiff from discharge, demotion, and other discrimination only if the misuse of funds was (1) "severe enough that the employee subjectively believes that it is 'gross'" and (2) "severe enough that a 'reasonabl[e]' employee in the plaintiff's position would consider it 'gross.'" *Hadley*, 2016 WL 1071098, at *5 (quoting ARRA § 1553(a), 123 Stat. at

297) (citing *Livingston v. Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008); *White v. Dep't of the Air Force*, 391 F.3d 1377, 1381–82 (Fed. Cir. 2005); and *Gerhard v. D Constr., Inc.*, No. 11-0631, 2012 WL 893673, at *2–3 (N.D. Ill. Mar. 14, 2012). When applying this standard, courts adopt principles used when applying "substantially identical language in the Whistleblower Protection Act ('WPA'), 5 U.S.C. § 2302(b)(8)." *See id.* Accordingly, because whistleblower protection is not meant to allow employees to litigate policy disputes with their employers, gross mismanagement under the ARRA "occurs when the 'conclusion that the employer erred is not debatable among reasonable people.'" *Id.* (brackets omitted) (quoting *White*, 391 F.3d at 1382).

WMATA argues that Ms. Wang fails to allege "that the alleged integration issues [in relation to WMATA's IFO Project] were gross mismanagement" and not "the normal occurrence of a system upgrade." Def.'s Mem. 32. Along these lines, WMATA elaborates that Ms. Wang provides "no point of reference for this Court to ascertain whether what she is describing as issues are technical glitches in a complicated system or the product of reckless management." *Id.*

The Court agrees. Ms. Wang spends just two pages of her opposition brief discussing the legal merits of her ARRA retaliation claim, and nowhere in those two pages does she establish that she disclosed WMATA actions that rise to the level of "gross" mismanagement, waste, or abuse. *See* Pl.'s Opp'n 37–38. And, from the Court's review of the record, whether WMATA's actions in relation to the IFO Project rose to the level of "gross" mismanagement appears to be a question that reasonable people could debate. *Compare* Am. Compl. 8–13 ("[Ms.] Wang reported gross mismanagement of the IFO project . . . ."), *with* Audette Dep. 147:19–149:9, Pl.'s Statement Ex. 2, ECF No. 20-4 (contending that WMATA anticipated issues with the IFO Project as "part of the correction process"). Because Ms. Wang does not argue otherwise, the

Court concludes that a reasonable jury could not find, by a preponderance of the evidence, that Ms. Wang made a protected disclosure under the ARRA. *See* ARRA § 1553(a), 123 Stat. at 297 (requiring plaintiffs to disclose "gross" mismanagement, waste, or abuse—or, alternatively, an illegal act or "substantial and specific danger to public health or safety"—to receive protection under the ARRA whistleblower provision); *Hadley*, 2016 WL 1071098, at *4 (explaining that plaintiffs must prove the three elements of an ARRA whistleblower claim "by a preponderance of the evidence"). Because Ms. Wang therefore fails to establish the first element of her ARRA whistleblower claim—that she made a protected disclosure under the ARRA—the Court must award summary judgment on that claim to WMATA. *See Hadley*, 2016 WL 1071098, at *4–5 (listing the three elements of an ARRA whistleblower claim, and noting that the plaintiff satisfies the first element by proving that she "made a protected disclosure").

## V.  CONCLUSION

On the record presented, the Court concludes that a reasonable jury could find that WMATA terminated Ms. Wang's employment for discriminatory or retaliatory reasons, in violation of Title VII of the Civil Rights Act of 1964. But for Ms. Wang's retaliation claim under the whistleblower provision of the American Recovery and Reinvestment Act of 2009, the Court concludes that a reasonable jury could not find in Ms. Wang's favor. For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 19) is **GRANTED IN PART** and **DENIED IN PART**.[43] An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  July 25, 2016                                        RUDOLPH CONTRERAS
                                                                     United States District Judge

---

[43] The Court denies as moot Ms. Wang's request for an oral hearing. *See* Pl.'s Opp'n 40.